ANGEL & FRANKEL, P.C.
Special Bankruptcy Counsel to
DaimlerChrysler Corporation
460 Park Avenue
New York, New York 10022-1906
(212) 752-8000
Bonnie L. Pollack, Esq. (BP-3711)

ABELMAN FRAYNE & SCHWAB
Intellectual Property Counsel to
DaimlerChrysler Corporation
150 East 42nd Street
New York, NY 10017
(212) 949-9022
Peter J. Lynfield, Esq. (PL-1398)
Victor M. Tannenbaum, Esq. (VT-5754)

**Bid Procedures Hearing Date: 9/30/04**
**Time: 9:30 a.m.**
**Sale Hearing Date: 10/4/04**
**Time: 9:00 a.m.**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

In re:                                    Chapter 7

ACCLAIM ENTERTAINMENT, INC.,              Case No. 804-85595-288

                        Debtor.
-----------------------------------------------------x

### LIMITED OBJECTION OF DAIMLERCHRYSLER CORPORATION TO TRUSTEE'S MOTION FOR AN ORDER, *INTER ALIA*, AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF INTELLECTUAL <u>PROPERTY LICENSE AGREEMENT</u>

TO:    THE HONORABLE STAN BERNSTEIN,
       UNITED STATES BANKRUPTCY JUDGE:

DaimlerChrysler Corporation ("DCC"), by its attorneys, Angel & Frankel, P.C. and Abelman Frayne & Schwab, as and for its limited objection to the motion of Allan B. Mendelsohn, Esq. (the "Trustee"), chapter 7 trustee of the estate of Acclaim Entertainment, Inc. (the "Debtor"), seeking an order, *inter alia*, authorizing the sale of the Debtor's rights in connection with the video game known as "Juiced" ("Juiced") and the assumption and assignment of certain agreements with respect thereto, respectfully represents as follows:

76278_3.DOC MS Word

## INTRODUCTION

1.      On September 1, 2004 (the "Filing Date"), the Debtor filed a voluntary petition for relief under chapter 7 of title 11, United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of New York.

2.      The Trustee was appointed the interim chapter 7 trustee of the Debtor's estate and, upon information and belief, is currently acting in such capacity.

3.      By motion dated September 21, 2004 (the "Juiced Motion"), the Trustee is seeking an order of the Bankruptcy Court approving bid procedures for, and scheduling a hearing for approval of, the sale of certain assets of the Debtor in connection with the Juiced game to Take 2 Interactive Software, Inc. ("Take 2") or a higher and better bidder (the "Juiced Sale"). The Trustee also seeks approval of the assumption and assignment to Take 2 or such other higher and better bidder, of certain agreements including the "Other Critical Agreements", defined in the Juiced Motion as license agreements with various automobile manufacturers, music providers and after-market automotive parts and accessory manufacturers relating to the Debtor's use of the images and trademarks in the game Juiced.

4.      By order dated September 21, 2004 (the "Scheduling Order"), the Bankruptcy Court scheduled a hearing to approve the requested bid procedures in connection with the Juiced Sale for September 30, 2004, and a hearing to approve the Juiced Sale (the "Sale Hearing") for October 4, 2004.  The Scheduling Order includes a deadline of September 29, 2004 at 1:00 p.m. for filing objections "to the relief requested" (the "Objection Deadline").  The Scheduling Order is unclear as to whether this deadline is only for the proposed bid procedures and another deadline will be established for objecting to the Juiced Sale, or whether the Objection Deadline also applies to the subsequent approval of the Juiced Sale.  Thus, although this limited objection is filed mainly in connection with the approval of the Juiced Sale, it is being filed by the

Objection Deadline in an abundance of caution.  Notwithstanding this, because of the time constraints imposed by the Scheduling Order, DCC reserves the right to supplement this objection at or prior to the Sale Hearing.

## **BACKGROUND**

5.     DCC is a worldwide manufacturer of various brands of motor vehicles.  Prior to the Filing Date, the Debtor and Brand Sense Marketing ("Brand Sense"), DCC's licensing agent, participated in discussions and negotiation of an intellectual property license agreement whereby the Debtor would be provided the non-exclusive right to use certain of DCC's trademarks, service marks, trade dress, designs, and copyrights in connection with the Juiced game.  As a result of those negotiations, Brand Sense forwarded to the Debtor a form of licensing agreement, together with an attachment of essential terms (the "Attachment").  A copy of the subject agreement (the "DCC License Agreement") is annexed hereto as Exhibit "A".

6.     As provided in the letter of transmittal sent to the Debtor with the DCC License Agreement, a copy of which is annexed hereto as Exhibit "B", DCC "reserve[d] the right to modify, change or amend the [DCC License] Agreement at any time before execution" by DCC. DCC has never given final approval of the modifications to the DCC License Agreement requested by the Debtor.

7.     As set forth in the section of the Attachment entitled "Guarantee" as well as in the transmittal letter, the Debtor was required to return the executed DCC License Agreement to Brand Sense together with an advance payment of $30,000 (the "Advance").  It is DCC's standard practice that it will not even consider for execution any license agreement which is not accompanied by the requisite advance fee.  Indeed, the transmittal letter expressly notified the Debtor that Brand Sense will only submit the DCC License Agreement to DCC for execution

after the Advance is received.  It further makes clear that if the Debtor develops its product prior to receiving an executed copy of the agreement, it would do so at its own risk. Although the Debtor executed the DCC License Agreement and returned the same to Brand Sense, it did not make the mandatory payment of the Advance. Thus, the DCC Licensing Agreement was not presented to DCC for signature, DCC never gave final approval of, or initialed, the changes requested by the Debtor, and the DCC License Agreement remained unexecuted and therefore not in effect as of the Filing Date.

8.      As more fully discussed below, DCC opposes the Juiced Motion to the extent it seeks to assume and assign the DCC License Agreement to Take 2 or any other successful buyer. First, no executed agreement exists between the parties capable of being assumed and assigned. Further, even if the DCC License Agreement is deemed to be an executory contract capable of assumption and assignment notwithstanding that it was never executed, non-bankruptcy law does not permit the assignment of the DCC License Agreement absent DCC's consent and DCC does not consent to the assumption and assignment of the DCC License Agreement.  Should the Court permit the assignment notwithstanding the clear statutory and case law prohibiting same, the Debtor must cure all monetary defaults, including the $30,000 Advance, and all non-monetary defaults prior to assumption of the DCC License Agreement.  Finally, in the event the Court finds that the DCC License Agreement is capable of assumption and assignment irrespective of all of the foregoing arguments, adequate assurance of future performance by Take 2 or another eventual successful bidder has not been demonstrated and therefore the DCC License Agreement may not be assumed and assigned in any event.

## THE DCC LICENSE AGREEMENT MAY NOT BE ASSUMED AND ASSIGNED BY THE TRUSTEE

### A.      No Executed Contract Exists

9.      First, section 365 of the Bankruptcy Code and the rights thereunder relate only to "executory contracts" which exist at the time of the filing of a bankruptcy case.  As a matter of law, only executory contracts that are in existence as of the time of the commencement of a case may be assumed and assigned; if no contract exists, there is nothing to assume and assign.  *See* Lawrence P. King et. al, 3 Collier on Bankruptcy ¶ 365.02[2] (15th Ed. 1997).  Here, no agreement was entered into prior to the Filing Date due to the Debtor's failure to pay the Advance upon which the execution of the contract by DCC was conditioned, there is therefore nothing to assume and assign under section 365 of the Bankruptcy Code.  Approval of the assumption and assignment of same must therefore be denied as no agreement was ever in effect between DCC and the Debtor.

### B.      Assignment of the DCC License Agreement is Prohibited

10.     Furthermore, even if the unexecuted DCC License Agreement is somehow deemed an executory contract, it is still incapable of assumption and assignment.  As set forth in the Juiced Motion, the Trustee alleges the right to assign the Other Critical Agreements (including the DCC License Agreement) under section 365(f)(2) of the Bankruptcy Code.  The Trustee claims that as long as adequate assurance of future performance by the assignee of the contracts is provided, and payments of any defaults under the contracts are made, it is able to assume and assign the Other Critical Agreements.

11.     The Trustee blatantly ignores the fact that the majority, if not all of the Other Critical Agreements, including the DCC License Agreement, are licenses of intellectual property.

This is especially important since such licenses are invariably dealt with in the context of section 365(f)(1) of the Bankruptcy Code, which provides, in part:

> Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection ….

11 U.S.C. § 365(f)(1).

12.    Section 365(c) of the Bankruptcy Code, the exception to section 365(f)(1), provides, in part:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment ….

11 U.S.C. § 365(c)(1).

13.    Thus, although section 365(f)(1) provides that anti-assignment clauses and "applicable law" restrictions on the assignability of executory contracts do not apply in the bankruptcy context, that subsection is expressly subject to section 365(c).

14.    In this case, the DCC License Agreement is a license of various intellectual property rights, including without limitation trademarks and copyrights.  As is evidenced by the terms of the DCC License Agreement, it is a non-exclusive license of such rights.  For instance, the third "whereas" of the DCC License Agreement provides that DCC is willing to grant a "non-exclusive" license to the Debtor upon the terms and subject to the conditions of the DCC License Agreement.  Paragraph 1 of the DCC License Agreement also provides that DCC "grants to

[Debtor] a non-exclusive license to use the Mark . . .” .  Similarly, in that portion of the Attachment entitled "Exclusivity", it is stated that the DCC License Agreement is "non-exclusive".  Thus, the DCC License Agreement is clearly a "non-exclusive" intellectual property license for use of, among other things, DCC's trademarks, copyrights, and other such intellectual property rights.

15.     The DCC License Agreement contains a provision which prohibits assignment. Specifically, paragraph 9 of the DCC License Agreement provides, in part, that "this Agreement is personal to Licensee.  Licensee shall not assign or sub-license this or any part of this Agreement.  Licensee shall not represent in any manner that Licensee has a right to sublicense the Mark…". Although this anti-assignment language would be inapplicable under section 365(f)(1) of the Bankruptcy Code, because both non-exclusive copyrights and trademark licenses are not assignable under applicable non-bankruptcy law, they are also not assignable under the Bankruptcy Code, absent the licensor's consent, pursuant to the exception found in section 365(c) of the Bankruptcy Code.

16.     In the trademark context, the District Court for the Southern District of New York in *Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc., et al.*, 925 F. Supp. 212 (S.D.N.Y. 1996), discussed the rights of licensees to assign and sub-license trademark rights under non-bankruptcy law.  As stated by the District Court, "the general rule is that unless the license states otherwise, the licensee's right to use the licensed mark is personal and cannot be assigned to another", *citing* McCarthy on Trademarks and Unfair Competition § 18.14 [2] (3d ed. 1996) (citing *Raufast S.A. v. Kicker's Pizzazz, Ltd.*, 208 U.S.P.Q. 699 (E.D.N.Y. 1980)). *Tap*, 925 F. Supp. at 218.  The *Tap* court discussed the rationale for the prohibition of assignment of non-exclusive trademark licenses absent the licensor's consent, and concluded that

the rationale is based on the licensor's duty under trademark law to control the quality of goods sold under its trademarks. Because the licensor has such a duty, it must have the right to pass upon the abilities of new potential licensees, and would lose that right without the ability to consent to an assignment or sub-license. Thus, the District Court found that the plaintiff's argument that trademark rights are assignable absent express language to the contrary in an agreement is incorrect, and that the rights are non-assignable under applicable law.

17.    Similarly, in *In re Travelot Co.*, 286 B.R. 447 (Bankr. S.D. Ga. 2002), the Court determined that " '[a]pplicable law' sufficient under § 365(c) to excuse a party to a contract from 'accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession' includes intellectual property law governing the assignment of licenses. (citations omitted)". *Travelot*, 286 B.R. at 454. The court further found that federal trademark law (*i.e.*, the Lanham Trademark Act) precluded assignment of a trademark license absent consent of the licensor, and that a licensor need not accept performance from or render performance to an entity other than the licensee. *Travelot*, 286 B.R. at 455.

18.    The court in *Miller, et al., v. Glenn Miller Productions*, 318 F.Supp. 2d 923 (C.D. Cal. 2004), also cited to the rationale precluding assignment of trademarks to extend what it referred to as the "sub-licensing rule" to a trademark license. Specifically, the *Miller* court stated that "[i]t is well established in patent and copyright law that a patent or copyright licensee may not sub-license his licensed intellectual property rights without express permission from the licensor (citations omitted).... Although the Ninth Circuit has not addressed whether the sub-licensing rule applies to trademark licenses, the courts that have addressed the issue have uniformly held it does, and thus that a trademark licensee may not sub-license a mark without express permission from the licensor.", *citing Tap, supra; Travelot, supra*. The reasoning behind

the court's extension of the sub-licensing rule to trademarks was that "'since the licensor-trademark owner has the duty to control the quality of goods sold under its mark, it must have the right to pass upon the abilities of new potential licensees.' (citations omitted)." *Miller,* 318 F.Supp. 2d at 933.

19.     In the copyright context, the Bankruptcy Court for the Southern District of New York has held that a debtor licensee could not assign its non-exclusive copyright license without the licensor's consent.  In *In re Patient Educ. Media, Inc.*, 210 B.R. 237 (Bankr. S.D.N.Y. 1997), the Bankruptcy Court found that a non-exclusive license does not transfer any rights of ownership, which remain in the licensor, and that the non-exclusive licensee does not acquire a property interest in the licensed right.   The Court further found that under applicable non-bankruptcy law, a non-exclusive license is personal to the transferee and the licensee cannot assign it to a third party without the consent of the copyright owner.  *Patient Educ. Media*, 210 B.R. at 240.  The Court held that although assignment of the license at issue would maximize the assets available to creditors, "this goal must give way to the countervailing considerations expressed in section 365(c),"  and that a non-exclusive copyright license cannot be assigned absent the licensor's consent.  *Patient Educ. Media*, 210 B.R. at 243.

20.     The Bankruptcy Court in *In re Buildnet, Inc.*, Case Nos. 01-82293 through 01-82299, 2002 Bankr. LEXIS 1851 (Bankr. N.D.N.C. 2002) also found, in the context of non-exclusive copyright licenses, that the same are personal to the transferee and cannot be assigned without the consent of the licensor.  The *Buildnet* court held that "[s]ince a non-exclusive license may not be assigned by a licensee under applicable copyright law, a debtor in possession may not assign a non-exclusive license absent consent of the non-debtor party as provided by 11

U.S.C. § 365(c), *citing In re Access Beyond Techs., Inc.*, 237 B.R. 32 (Bankr. D. Del. 1999); *Patient Educ. Media*, *supra*; *Buildnet*, 2002 Bankr. LEXIS 1851, at *15.

21.     Lastly, the Court in *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300 (Bankr. D. Del. 2001) also decided that under applicable copyright law, a non-exclusive license cannot be assigned unless the licensor authorizes the assignment, and that the same may therefore not be assumed and assigned under the Bankruptcy Code. *Golden Books*, 269 B.R. at 310-311.

22.     The foregoing case law makes clear that applicable copyright and trademark law prohibits the assignment of non-exclusive license agreements absent the consent of the licensor. The law also makes clear that if such agreements are not assignable outside of bankruptcy, they are also not assignable by a debtor in a bankruptcy case by virtue of section 365(c) of the Bankruptcy Code.  Thus, without DCC's consent, the DCC Licensing Agreement may not be assumed and assigned by the Trustee.

23.     Indeed, the Juiced Motion itself contemplates the need for DCC's consent to the assignment.  As set forth in the letter of intent dated September 20, 2004 by and between the Trustee and Take 2, various conditions to the Juiced Sale exist.  Such conditions include but are not limited to:  (i)  delivery to Take 2 of executed copies of written license agreements with the licensors of material automobile manufacturer license rights pertaining to the game Juiced in a form and of substance satisfactory to Take 2; (ii) the exercise of the Estate's best efforts to assume and assign to Take 2 all license agreements with licensors of all automobile manufacturer license rights and licensors of other rights pertaining to the name Juiced; and (iii) delivery to Take 2 of written confirmations from the licensors of automobile manufacturer licensor rights that any and all of their respective intellectual and other property related to the game Juiced

including, without limitation, their trademark, copyright and other rights in the design, appearance and performance of automobiles and models used in the game Juiced, have been approved by such licensors. Given the requirement of consent in the letter of intent, the Trustee and Take 2 obviously recognize the need for same under non-bankruptcy law. Since DCC does not consent to the assignment, the Juiced Motion as it pertains to the DCC License Agreement must therefore be denied.

## C.    The DCC License Agreement May Not be Assumed Absent Cure of Defaults

24.    In the unlikely event the Court finds that the DCC License Agreement is both an executory contract and one which is capable of assignment notwithstanding applicable non-bankruptcy law, in order for the Debtor to assign the DCC License Agreement it must first assume same under section 365(b)(1) of the Bankruptcy Code. That section provides that where there has been a default in an executory contract, it may not be assumed unless, at the time of the assumption, the trustee, among other things, cures, or provides adequate assurance that the trustee will promptly cure, such default. In this case, if the Court were to find that an executory contract exists, it must also necessarily find that there were defaults by the Debtor in connection with the contract in that the Debtor failed to pay the Advance to DCC, which Advance is a condition to effectiveness of the DCC License Agreement. Additionally, there may exist various non-monetary defaults, including without limitation the Debtor's failure to provide samples of its product to DCC (§ 2.2 of DCC License Agreement), the failure to obtain DCC's approval of the quality of such samples (§ 2.3 of the DCC License Agreement) and the failure to supply advertising and marketing materials for approval by DCC (§ 3 of DCC License Agreement). Thus, in the event that the Court finds that the DCC License Agreement is an executory contract capable of assumption and assignment, before it can assign same, it must assume same and in

order to do so, it must cure its monetary default by the payment of the $30,000 Advance to DCC, and cure any non-monetary defaults which may exist.

25.     Furthermore, as DCC has not yet given final approval of the changes made to the DCC License Agreement, any assumption and assignment must first be conditioned upon the prior approval of any such changes.

**D.      No Adequate Assurance of Future Performance**

26.     Finally, even if the Court finds the existence of an executory contract which is capable of assumption and assignment notwithstanding the applicable non-bankruptcy law and section 365(c) of the Bankruptcy Code, the Trustee has not satisfied section 365(f)(2)(B) of the Bankruptcy Code which provides that a trustee may assign an executory contract only if adequate assurance of future performance by the assignee is provided.  Here, as to Take 2, the Trustee makes the simple allegation that Take 2 is a well known distributor of products of this nature, is a profitable public entity and that it is a strong competitor in this industry.  No financial information or documentation is provided to enable DCC or the Court to determine whether indeed adequate assurance of future performance can be shown by Take 2.  Thus, DCC does not believe that the Trustee's burden on this issue has been satisfied and, as a result, contends that the DCC License Agreement cannot be assigned to Take 2 in any event.

27.     It is essential that DCC be able to review all information necessary to determine whether Take 2 or another buyer is an appropriate assignee and can provide adequate assurance of future performance.  It is the policy of DCC that certain criteria must be met by all licensees of DCC's trademarks and other intellectual property.  DCC requires strict adherence by all of its licensees to the standards established by DCC with respect to the use of its trademarks and other intellectual property, including but not limited to the quality of the licensed product and the manner of use of the trademarks and intellectual property on the product and in advertising.

DCC also may not permit the granting of a license to a third party who may be a competitor of DCC or related to a competitor of DCC.  For the foregoing reasons, the guarantee of future performance by any licensee that such licensee will adhere to the standards required by DCC prior to the assumption of the DCC License Agreement is essential to DCC, as well as a determination by DCC as to the identity, affiliations and other activities of any such licensee.  In the absence of such guarantees, DCC will be at risk of damaging its trademark and other intellectual property rights.

28.     Moreover, competing bids for the assets being sold through the Juiced Sale, including the assumption and assignment of the various agreements, are not required to be made until 12:00 p.m. on September 30, 2004 pursuant to the proposed bid procedures.  It is therefore possible that, at the Sale Hearing, a buyer other than Take 2 will be the successful purchaser.  However, there will not be an adequate opportunity for DCC or the Court to determine whether any other possible successful bidder can provide adequate assurance of future performance.  Given DCC's need to determine the identity and affiliations of all of its licensees, at a minimum, DCC's counsel should be provided with the identity and affiliations of any competing bidders at the time their bids are made. All financial and other documentation necessary to make a determination as to the bidders' ability to provide adequate assurance of future performance should also be supplied with competing bids and forwarded to DCC's counsel immediately upon receipt.  Such financial and other documentation to be relied on by Take 2 to establish adequate assurance of future performance should also be immediately forwarded, and DCC shall be given a reasonable time to be able to review and consider any such financial and other information.  In any event, until a determination can be made based on actual financial and other documentation

that Take 2 or any other successful bidder can provide adequate assurance of future performance, the assignment cannot be granted.

## CONCLUSIONS

29.     As demonstrated above, there are various reasons why the Juiced Motion should be denied insofar as it seeks to assume and assign the DCC License Agreement.  Significantly, no agreement was ever executed by the parties prior to the Filing Date and therefore no executory contract exists which is capable of assumption and assignment.

30.     Even if such an agreement is deemed to exist, which DCC does not concede, applicable non-bankruptcy law does not permit the assignment of the DCC License Agreement absent DCC's consent.

31.     If the Court finds that the DCC License Agreement is nevertheless assignable notwithstanding the case law, the Trustee cannot assume and assign same without curing default in the payment of the $30,000 Advance and any non-monetary defaults which may exist as well as obtaining all approvals from DCC as required in the DCC License Agreement with respect to the form and manner of use of trademarks and other intellectual property and the quality of the licensed product, including provision of samples of the licensed product for review and approval by DCC.

32.     In any event, adequate assurance of future performance by Take 2 or any other successful bidder has not been established, necessitating denial of the assignment of the DCC License Agreement.

33.     Accordingly, for the reasons set forth herein, it is requested that the Court deny that portion of the Juiced Motion which seeks authority to assume and assign the DCC License Agreement.

WHEREFORE, DCC requests that the Court deny the relief sought in the Juiced Motion as it pertains to the DCC License Agreement, and grant DCC such other and further relief as the Court deems just and proper.

Dated: New York, New York
      September 29, 2004

ANGEL & FRANKEL, P.C.
Special Bankruptcy Counsel to
DaimlerChrysler Corporation

By:  /s/Bonnie L. Pollack
        Bonnie L. Pollack, Esq. (BP-3711)
460 Park Avenue
New York, NY 10022
(212) 752-8000

ABELMAN FRAYNE & SCHWAB
Intellectual Property Counsel to
DaimlerChrysler Corporation

By:  /s/Victor M. Tannenbaum
     Peter J. Lynfield, Esq. (PL-1398)
     Victor M. Tannenbaum, Esq. (VT-5754)
150 East 42nd Street
New York, NY  10017
(212) 949-9022