# Project Management and Facility Agreement

(1)     F4G Software Limited

(2)     Juice Games Limited

(3)     F4G Development 2 LLP

(4)     Acclaim Entertainment, Inc.

Dated 6 November 2003

## Osborne Clarke

**Bristol Office**

2 Temple Back East, Temple Quay, Bristol BS1 6EG
Telephone 0117 917 3000  Facsimile 0117 917 3005

**London Office**

Hillgate House, 26 Old Bailey, London EC4M 7HW
Telephone 020 7809 1000  Facsimile 020 7809 1005

**Thames Valley Office**

Apex Plaza, Forbury Road, Reading RG1 1AX
Telephone 0118 925 2000  Facsimile 0118 925 0038

Web sites: www.osborneclarke.com
          www.ocalliance.com

535147_2.DOC

# Contents

1.     Definitions and Interpretation ............................................................. 2
2.     Management of the Project ................................................................ 6
3.     Funding of the Project....................................................................... 6
4.     Reimbursement of Funding and Royalties......................................... 7
5.     Security Provisions .......................................................................... 9
6.     Project Slippage ............................................................................ 10
7.     Events of Default and Insolvency .................................................. 10
8.     The Development Agreement ......................................................... 11
9.     Warranties ..................................................................................... 13
10.    Confidential Information................................................................. 13
11.    Assignment and Sub-Contracting .................................................. 14
12.    Notices .......................................................................................... 15
13.    General .......................................................................................... 15
Schedule 1 ................................................................................................ 18
Schedule 2 ................................................................................................ 20
Schedule 3 ................................................................................................ 22
Schedule 4 ................................................................................................ 25
Schedule 5 ................................................................................................ 33
Schedule 6 ................................................................................................ 37
Schedule 7 ................................................................................................ 39

This Agreement is made the $6$ day of November 2003

**Between:**

(1)     **F4G Software Limited** (registered number SC 247180) whose registered office is at 76 George Street, Edinburgh EH2 3BU ("**F4G**");

(2)     **Juice Games Limited** (registered number 04642032) whose registered office is at Number One, Old Hall Street, Liverpool, Merseyside, L3 9HF ("**Juice**");

(3)     **F4G Development 2 LLP** (registered number S0 300279) whose registered office is 76 George Street, Edinburgh EH2 3BU ("**the LLP**"); and

(4)     **Acclaim Entertainment, Inc.** whose principal place of business is at One Acclaim Plaza, Glen Cove, NY 11542, USA ("**Acclaim**").

**Background:**

(A)     F4G and Juice have agreed to jointly develop the Game (as defined below).  F4G and Juice have established the LLP, an entity owned equally by F4G and Juice, in order to implement the development and exploitation of the Game.

(B)     On or around the date of this Agreement, the LLP and Acclaim entered into the Development Agreement under which the LLP agreed to develop the Game for Acclaim and to grant Acclaim a licence to publish the Game.

(C)     On or around the date of this Agreement, F4G, Juice and the LLP entered into the Development Services Agreement under which Juice agreed to provide the LLP with the development services required by the LLP in order to enable the LLP to meet its obligations to Acclaim under the Development Agreement.

(D)     F4G has agreed to provide the LLP with project management services in respect of the development of the Game and to fund the development of the Game.

(E)     F4G, Juice, the LLP and Acclaim have agreed to enter into this Agreement in order to set out the terms on which F4G shall provide the project management services and the funding referred to in recital D above, and to set out some other terms that they have agreed in relation to the development of the Game.

535147_2.DOC

**It is agreed** as follows:

1.      **Definitions and Interpretation**

1.1     In this Agreement, unless the context otherwise requires, the following
        words shall have the following meanings:

| | |
|---|---|
| **"Actual Cost"** | the actual cost of developing a Version at any relevant time, calculated in accordance with Schedule 2. |
| **"Advances"** | the aggregate amount of the advances paid by F4G to the LLP under clause 3.2(a) of this Agreement at any relevant time. |
| **"this Agreement"** | this Agreement (including any schedule or annexure to it). |
| **"the Ancillary Agreement"** | the letter agreement entered into between Juice, the LLP and Acclaim relating to the Game on or around the date of this Agreement. |
| **"BoS "** | The Governor and Company of the Bank of Scotland (or any alternative bank that F4G notifies to Juice in accordance with clause 5.3). |
| **"BoS Charge and Debenture"** | the legal charge and debenture that the parties envisage will be given by the LLP in favour of BoS . |
| **"BoS Facility Letter"** | the letter agreement relating to the facility that the parties envisage will be made available by BoS to F4G to fund the development of the Game as the same may be amended, waived, supplemented or replaced from time to time. |
| **"Business Day"** | a day (other than a Saturday) on which banks are open for business in London. |
| **"the Development Agreement "** | the development agreement entered into between the LLP and Acclaim on or around the date of this Agreement. |
| **"the Development Services Agreement"** | the development services agreement entered into between the LLP and Juice on or around the date of this Agreement. |

| | |
|---|---|
| **"Event of Default"** | the occurrence of any of the events or circumstances set out in Schedule 6. |
| **"Expenses"** | £50,000 (plus VAT) in respect of the professional accountancy and legal fees of McCabes and Osborne Clarke reasonably incurred by or on behalf of F4G in connection with the Project. |
| **"F4G Default or Insolvency Event"** | the occurrence of any of the events or circumstances set out in paragraph 5.1 of Schedule 4. |
| **"Game"** | the entertainment software product provisionally known as *"Redline Street Racer"* to be developed by Juice under the Development Services Agreement. |
| **"Game Materials"** | means all script, speech, images, characters, characterisations, designs, graphics, artwork, objects, sound, music, computer code, technology and other materials created by or on behalf of Juice, prior to the date of this Agreement or at any time between the date of this Agreement and the Project Completion Date which are included in the Game. |
| **"Games Names"** | means the name *"Redline Street Racer"* (or such other name as the parties may agree in writing) and all trade names, trade marks, character names or other identifications owned by Juice and used in the Game. |
| **"Juice Expenses"** | £ 8,000 (plus VAT) in respect of the legal fees and disbursements of Weightman Vizards reasonably incurred by or on behalf of Juice in connection with the Project other than in respect of the Development Agreement. |
| **"Insolvency Event"** | the occurrence of any of the events or circumstances set out in Paragraph 12(d) of the Development Agreement. |
| **"Intellectual Property Rights"** | means patents, know-how, registered and unregistered trade marks and service marks (including, without limitation, any trade, brand or business names), domain |

names, registered designs, design rights, utility models, copyright (including without limitation all such rights in computer software, information, know-how and techniques in whatever form held and any databases), moral rights and topography rights (in each case for the full period thereof and all extensions and renewals thereof), applications for any of the foregoing and the right to apply for any of the foregoing in any part of the world and all industrial and intellectual property rights and any similar rights situated in any country.

**"Licence Fees"** — the licence fees payable by Acclaim to the LLP in respect of the Versions, details of which are set out in paragraph 1.1 of Schedule 2.

**"Members Agreement"** — the agreement entered into between F4G, Juice and the LLP in respect of the LLP on or around the date of this Agreement.

**"Milestone Deliverable"** — the milestone deliverables submitted by Juice to the LLP under the Development Services Agreement.

**"Milestone Schedule"** — the milestone and delivery schedule attached to the Development Agreement.

**"Project"** — the project to develop the Versions set out in this Agreement, the Development Agreement, the Ancillary Agreement and the Development Services Agreement.

**"Project Budget"** — £1,975,000 (subject to increase in accordance with clause 6.3).

**"Project Managers"** — the individuals engaged by or appointed by F4G to provide the Project Management Services (being John Oldham and Tim Gatland or such alternative or additional individuals as F4G may appoint from time to time).

**"Project Management Services"** — the project management services to be provided by F4G in respect of the Project described in Schedule 1.

| **"Project Management Fee"** | a fee of 7% of the amount of each Advance paid by F4G under clause 3.2(a). |
| **"Third Party Agreement"** | an agreement between Juice and a third party publisher (excluding Acclaim) in respect of any Version. |
| **"Versions"** | the three versions of the Game to be developed by Juice under the Development Services Agreement, being a Sony PlayStation 2 version, a Microsoft Xbox version, and a PC version. |

1.2     In this Agreement, unless otherwise provided or the context otherwise requires:

    (a)     words in the singular include the plural and vice versa and words in one gender include any other gender;

    (b)     a reference to:

        (i)     a **"person"** includes any individual, firm, body corporate, association or partnership, government or state (whether or not having a separate legal personality);

        (ii)     **"clauses"** and **"schedules"** are to clauses of and schedules to this Agreement; and

        (iii)     references to **"paragraphs"** are references to paragraphs of the schedules in which they appear and references to **"Paragraphs"** are references to paragraphs of the Development Agreement.

    (c)     the headings are for convenience only and shall not affect the interpretation of this Agreement; and

    (d)     statutory provisions shall be construed as references to those provisions as respectively amended, consolidated, extended or re-enacted from time to time and to any orders, regulations, instruments or other subordinate legislation made under the relevant statute.

1.3     In this Agreement the term **"agreed form"** in relation to any document means the form agreed between F4G and Juice and, for the purposes of identification only, initialled by or on behalf of Juice and F4G.

535147_2.DOC

2.      **Management of the Project**

2.1     F4G shall provide the Project Management Services from the date of this Agreement to the completion or termination of the Project.

2.2     At any time during the Project, F4G may appoint an alternative or additional individual as a Project Manager. F4G shall promptly notify Juice and Acclaim in writing of any such change and provide Juice and Acclaim with the name of the new Project Manager and (if relevant) the name of the individual being replaced.

2.3     Juice and Acclaim shall provide the Project Managers with such information and assistance as the Project Managers may reasonably require in connection with the Project. In particular, Juice shall provide the Project Managers with reasonable access during Juice's normal working hours to the premises at which Juice is developing the Versions, the individuals involved in the development of the Versions and all work in progress in respect of the development of the Versions.

2.4     At all times while on the premises of Juice and during the course of exercising any of F4G's rights under this clause 2, F4G shall comply and shall procure that the Project Managers shall comply with the reasonable written security and other policies and procedures in respect of access to any premises of Juice.

2.5     F4G's review and inspection rights set out in this clause 2 do not limit or restrict Acclaim's review and inspection rights under section 2 of the Ancillary Agreement. However, F4G and Acclaim shall use all reasonable commercial endeavours to co-ordinate the exercise of their respective review and inspection rights in so far as it is reasonably practicable to do so, so that the exercise of these rights are conducted in such a way to minimise disruption to Juice's business.

3.      **Funding of the Project**

3.1     Within 5 Business Days following the date of this Agreement, F4G shall advance to the LLP, and the LLP shall pay to Acclaim, £264,000 to reimburse Acclaim in respect of the amounts of the Project Budget that Acclaim has paid to Juice prior to the date of this Agreement.

3.2     Within 2 Business Days of the date on which Acclaim and F4G have both approved a Milestone Deliverable under the Development Agreement, F4G shall:

        (a)     advance to the LLP, and the LLP shall within 2 Business Days of receipt pay to Juice the amount of the Project Budget applicable to that Milestone Deliverable as set out in Schedule 7; and

      (b)     apply the Project Management Fee in respect of the amount of the Project Budget applicable to that Milestone Deliverable to the costs it incurs in providing the Project Management Services.

3.3     In connection with the approval of each Milestone Deliverable Acclaim and F4G shall use the same criteria and time scales specified in Paragraph 2(d).

3.4     If the LLP terminates the Development Services Agreement in accordance with this Agreement pursuant to Schedule 4, then F4G's obligation to make advances of the Project Budget under clause 3.2 shall also terminate at the same time.  If the LLP terminates the development of a Version under the Development Services Agreement in accordance with this Agreement, then F4G's obligation to make advances of the Project Budget under clause 3.2 in respect of that Version shall also terminate at the same time.

## 4.     Reimbursement of Funding and Royalties

4.1     Acclaim shall pay:

      (a)     the Licence Fees to the LLP, in accordance with the Development Agreement; and

      (b)     within 5 Business Days of the date of this Agreement the Juice Expenses to Juice.

4.2     Not less than 10 days prior to the date on which the LLP is due to deliver the final milestone or Gold Master (as defined in the Development Agreement) in respect of a Version under the Development Agreement (whichever is the earlier), Acclaim shall at its election either:

      (a)     deposit the Licence Fees in respect of that Version into a commercial bank in the UK to be held in escrow for the LLP, to be released to the LLP upon the approval (or deemed approval) of the final milestone or Gold Master (whichever is the earlier) in respect of that Version in accordance with the Development Agreement and this Agreement; or

      (b)     provide the LLP with an irrevocable letter of credit in respect of the Licence Fees in respect of that Version, to be held by the LLP and not drawn down until the approval (or deemed approval) of the final milestone or Gold Master (whichever is the earlier) in respect of that Version in accordance with the Development Agreement and this Agreement.

4.3     The LLP and Juice shall not deliver final milestone or Gold Master of any Version to Acclaim under the Development Agreement unless and until Acclaim has complied with its obligations under clause 4.2. In addition, the licences granted by the LLP to Acclaim under Paragraphs 3(b)(i) and (vi) of the Development Agreement shall not become effective in respect of a Version unless and until Acclaim has paid the LLP and F4G the full amount of the Licence Fee in respect of that Version under clause 4.1(a) and 4.1(b) respectively.

4.4     Upon the LLP receiving the Licence Fee in respect of a Version from Acclaim under the Development Agreement, the LLP shall promptly pay that Licence Fee to F4G.

4.5     In the event of the earlier termination of the Project in respect of an individual Version as provided in paragraph 2 of Schedule 4, the LLP shall promptly pay all of the sums the LLP receives from Acclaim in respect of that Version as provided in paragraph 2 of Schedule 4.

4.6     Except as provided in Schedule 5 and subject to clause 4.8, F4G and Juice shall share all royalties arising under the Development Agreement in that F4G's shall be entitled to one and a half percentage points of the applicable royalty rate set out in the Development Agreement and Juice shall be entitled to the balance. Accordingly, subject to clause 4.3 by way of example, F4G shall share any royalty in respect of the Net Game Receipts (as defined in the Development Agreement) as follows:

| Version | F4G's share | Juice's share |
|---------|-------------|---------------|
| PC | 1.5% | 28.5% |
| PS2 | 1.5% | 23.5% |
| Xbox | 1.5% | 23.5% |

4.7     Accordingly, upon the LLP or F4G receiving any royalties from Acclaim under the Development Agreement (or from any third party under any agreement between the LLP or F4G and that third party in respect of the exploitation of the Game or the exploitation of any of the rights granted by Juice to the LLP or F4G under this Agreement or the Development Services Agreement), the LLP or F4G shall within 2 Business Days pay the appropriate amount of those royalties to Juice and the LLP shall within 2 Business Days pay to F4G (or in the case of royalties received by F4G, F4G shall be entitled to retain) the balance of those royalties.

4.8     F4G shall not be entitled to any royalties in respect of Net Game Receipts (as defined in the Development Agreement) unless and until sales of units of the Game exceed 400,000. Accordingly, until sales of units of the Game exceed 400,000 the full applicable royalty in respect

of sales of units set out in the Development Agreement shall be payable by LLP to Juice.

4.9     F4G shall use all sums received from Acclaim, the LLP or any other person in respect of the Game to discharge promptly all sums due by F4G to BoS under the BoS Facility Letter (if any).

5.      **Security Provisions**

5.1     F4G intends to secure a facility from BoS to enable F4G to fund the development of the Game. If F4G enters into a facility agreement with BoS under which BoS agrees to provide F4G with a facility in respect of the Game, then F4G shall notify Juice and:

        (a)     the LLP shall deliver to F4G the BoS Charge and Debenture duly executed by the LLP;

        (b)     Juice and the LLP shall provide F4G with such information and copies of such documents as F4G may reasonable require in order to enable F4G to provide BoS with the documents and evidence that F4G is required to provide to BoS under the terms of the BoS Facility Letter; and

        (c)     F4G shall use all reasonable commercial endeavours to procure from BoS a letter from BoS to Juice under which BoS confirms to Juice that BoS shall irrevocably release and discharge the BoS Charge and Debenture following the repayment in full to the satisfaction of BoS all sums due to BoS under the BoS Facility Letter.

5.2     Unless and until F4G enters into the BoS Facility Letter and the LLP executes and delivers to F4G the BoS Charge and Debenture, F4G's obligations in respect of the release and discharge of the BoS Charge and Debenture set out in clause 4.9 and in paragraph 2.3 of Schedule 3 and the provisos relating to the release and discharge of the BoS Charge and Debenture set out in paragraphs 5.2(d), 5.2(e), 5.3 and 5.4 of Schedule 4 shall be of no effect.

5.3     If F4G secures a facility to fund the development of the Game from a bank other than BoS, then F4G shall notify Juice accordingly and:

        (a)     the provisions of clause 5.1 shall apply to that facility in the same way as they would have applied if that facility had been provided by BoS; and

        (b)     references in this Agreement to "**BoS**" shall be read and construed as references to that other bank.

5.4     In order to enable F4G to exercise its right to take over the development and exploitation, or, as the case may be, the exploitation

of the Versions in the circumstances set out in Schedule 4, Juice and Acclaim grant to F4G the rights set out in paragraphs 1.2 and 1.3 of Schedule 5 respectively and shall comply with the procedures set out in paragraph 2 of Schedule 5.

6. **Project Slippage**

6.1 If F4G identifies any problems or potential problems in connection with the Project including any such problems or potential problems which exist or may exist prior to F4G taking over the development and exploitation, or, as the case may be, the exploitation of a Version, then it may seek to identify and propose to Juice individuals to join the team of Juice developing the Versions, either in addition to the members of that team or in substitution for one or more of the members of the team of Juice.

6.2 The appointment of any additional or alternative individual pursuant to clause 6.1 shall be subject to:

(a) the prior written approval of Juice and Acclaim (not to be unreasonably withheld); and

(b) such individual entering into a confidentiality agreement with Juice in a form reasonably acceptable to Juice.

6.3 If the appointment of an individual to the team of Juice developing the Versions which is made under clause 6.1 increases the size of the team of Juice above that specified in the Development Agreement, then:

(a) F4G shall pay the costs in respect of such individual (unless F4G and Juice agree in writing that Juice shall pay those costs in which case the amount of the subsequent Advances shall also be increased to reflect such costs); and

(b) the Project Budget shall be increased to reflect such costs.

6.4 Any increases in the Project Budget under clause 6.3 shall not increase the amount of the Licence Fees under the Development Agreement. In addition, nothing in clauses 6.1, 6.2 or 6.3 shall restrict or prevent Acclaim from exercising its right to terminate the Development Agreement (or the development of an individual Version) under Paragraph 12(b) of the Development Agreement.

7. **Events of Default and Insolvency**

7.1 If an Insolvency Event occurs in respect of the LLP or Acclaim or Juice, then the consequences are set out in paragraph 3 of Schedule 4.

535147_2.DOC

7.2     If an Event of Default occurs, then the consequences are set out in paragraph 4 of Schedule 4.

7.3     If an F4G Default or Insolvency Event occurs, then the consequences are set out in paragraph 5 of Schedule 4.

8.      **The Development Agreement**

8.1     Without relieving the LLP or Acclaim of the performance of any of its obligations under the Development Agreement, the LLP and Acclaim in exercising their rights and fulfilling their obligations under the Development Agreement shall also each comply with the provisions of Schedule 3.

8.2     If Acclaim terminates the Development Agreement or the development of a Version pursuant to Paragraph 11(e) or Paragraph 12(a) of the Development Agreement, then in addition to the consequences of such termination as set out in Paragraph 11(e) or Paragraph 12(a) of the Development Agreement respectively, the consequences of such termination are respectively set out in paragraphs 1 and 2 of Schedule 4.

8.3     If Acclaim terminates the Development Agreement as a result of an Insolvency Event under Paragraph 12(d) of the Development Agreement or if an Insolvency Event occurs in relation to Acclaim, then the consequences of such events are respectively set out in paragraphs 3.1 to 3.4 and paragraph 3.5 of Schedule 4.

8.4     Upon the termination of the Development Agreement for any reason, this Agreement shall immediately terminate with respect to Acclaim. If this Agreement terminates with respect to Acclaim under this clause, then all rights and obligations of Acclaim under this Agreement shall immediately cease to have effect, except that such termination shall not affect any accrued rights and obligations of Acclaim under this Agreement as at the date of such termination nor will it affect the coming into or continuation in force of any other provision of this Agreement which is expressly or by implication intended to come into force or continue in force on or after termination.

8.5     Upon the termination of the Development Services Agreement for any reason, this Agreement shall immediately terminate with respect to Juice and all rights and obligations of Juice under this Agreement shall immediately cease to have effect, except that such termination shall not affect any accrued rights and obligations of Juice under this Agreement as at the date of such termination, nor shall it affect the coming into or continuation in force of any other provision of this Agreement which is expressly or by implication intended to come into force or continue in force on or after termination.

8.6     If Acclaim wishes to terminate the development of the PS2 Version pursuant to Paragraph 12(b) of the Development Agreement, but nevertheless wishes to continue the development of either the Xbox Version or the PC Version (or both of those Versions), then without having to exercise its right to terminate the development of the PS2 Version under Paragraph 12(b) of the Development Agreement, Acclaim may initiate negotiations between the parties to this Agreement in relation to this aim in accordance with the following procedure:

(a)     Acclaim shall give written notice to F4G, Juice and the LLP, specifying the Version(s) that Acclaim wishes to continue to be developed following the termination of the PS2 Version;

(b)     following receipt of this notice, all of the parties shall promptly work together in good faith and shall use all reasonable commercial endeavours to agree such changes to the Project Budget, the Licence Fees and any other terms of this Agreement, the Development Agreement and the Development Services Agreement as may be reasonably necessary to enable F4G, Juice and the LLP to accept Acclaim's aim;

(c)     none of the parties shall unreasonably withhold or delay any consent that it may be asked to provide in connection with the negotiations referred to in this clause.

8.7     Any notice given by Acclaim under clause 8.6 shall not constitute a notice to terminate or abandon the development of the Game under Paragraph 12(b) of the Development Agreement or otherwise constitute a termination of the development of any of the Versions. Accordingly, a notice given by Acclaim under clause 8.6 shall not initiate any of the consequences set out in this Agreement or the Development Agreement that follow a termination of the development of a Version by Acclaim under Paragraph 12(b) of the Development Agreement, and none of the parties may exercise any of the rights set out or contemplated in this Agreement or the Development Agreement that arise as a consequence of a termination of the development of a Version by Acclaim under Paragraph 12(b) of the Development Agreement.

8.8     Acclaim and Juice shall provide F4G with an acknowledgement on a splash screen in each Version and in the credit section of the user manual of each Version. The size and form of such acknowledgements shall be subject to the approval of F4G (which shall not be unreasonably withheld). Any inadvertent failure by Acclaim to provide F4G with any such acknowledgement shall not constitute a breach of this Agreement, provided that Acclaim shall use reasonable efforts to prospectively cure any such inadvertent failure once Acclaim has been notified of the same.

535147_2 DOC

8.9    Acclaim shall furnish to F4G without charge 25 samples of each Version of the Game, such samples not to be resold by F4G.  F4G shall have the right to purchase additional copies of the Versions at Acclaim's cost therefor, such copies not to be resold or used for any advertising or promotional activities (except with Acclaim's prior written consent).

9.    **Warranties**

9.1    Each party irrevocably warrants, to each of the other parties as follows:

   (a)    it has the power to enter into this Agreement;

   (b)    once executed by it this Agreement constitutes legal, valid and binding obligations enforceable against it in accordance with the terms;

   (c)    there are no actions suits or proceedings or regulatory investigations pending or to its actual knowledge threatened against or affecting it before any court or administrative body or arbitration tribunal that affects its ability to perform its obligations under this Agreement; and

   (d)    the execution and performance of this Agreement has been duly authorised by all appropriate corporate actions in respect of it and, in particular, the person who signs this Agreement has been duly authorised to do so by it.

9.2    F4G warrants that the Project Management Services shall be performed with reasonable skill and care.

9.3    Juice irrevocably warrants, to F4G in relation to the Development Services Agreement the same things and in the same terms as those set out in clause 9.1 in relation to this Agreement.

9.4    Acclaim irrevocably warrants, to F4G in relation to the Development Agreement the same things and in the same terms as those set out in clause 9.1 in relation to the Agreement.

10.    **Confidential Information**

10.1    Each of the parties shall keep in confidence and subject to clause 10.3 shall not disclose to any third party, the terms of this Agreement without the written permission of the other parties and the Confidential Information of each party made known to the other under this Agreement without the written permission of the Other Party (as defined below).  As used in this clause 10, the term **"Confidential Information"** means confidential and proprietary business information of the disclosing party which is expressly labelled or identified to the receiving party in writing as "confidential" or which, under the

circumstances of such disclosure, the receiving party knows, or reasonably should know, are treated by the disclosing party as confidential.

10.2    This requirement of confidentiality shall not apply to information that is:

    (a)    in the public domain or becomes public knowledge through no wrongful act of the receiving party;

    (b)    rightfully received by the receiving party from a third party who is not bound by a restriction of nondisclosure;

    (c)    already in the receiving party's possession without restriction as to disclosure;

    (d)    independently developed without access to the Confidential Information of the other party; or

    (e)    required to be disclosed by applicable rules and regulations of government agencies or judicial bodies or the rules of any Stock Exchange.

10.3    Nothing in this clause 10 shall be deemed or construed to prevent any party (a "**Disclosing Party**") from disclosing the terms of this Agreement or any Confidential Information obtained from any other party (the "**Other Party**") to:

    (a)    any consultant, contractor, or other person engaged or employed by the Disclosing Party or any Subsidiary, associated company or Holding Company of the Disclosing Party; or

    (b)    any professional advisers, bankers or financial advisers of the Disclosing Party.

## 11.    Assignment and Sub-Contracting

11.1    F4G may not assign any of its rights or except as provided in clause 2.2 sub-contract any of its obligations under this Agreement without the prior written consent of the LLP, Juice and Acclaim (which shall not be unreasonably withheld).

11.2    Juice may not assign any of its rights or sub-contract any of its obligations under this Agreement without the prior written consent of F4G, Acclaim and the LLP (which shall not be unreasonably withheld).

11.3    Juice may not assign any of its rights or sub-contract any of its obligations under the Development Services Agreement without the prior written consent of F4G and the LLP (which shall not be unreasonably withheld).

11.4    Acclaim may not assign any of its rights or sub-contract any of its obligations under this Agreement or except as provided under the Development Agreement the Development Agreement without the prior written consent of F4G, Juice and the LLP (which shall not be unreasonably withheld).

11.5    The LLP may assign any of its rights and sub-contract any of its obligations under the Development Agreement. In particular (but without limitation), the LLP may assign to F4G and to Juice the right to receive their share of any royalties arising under the Development Agreement in the proportions set out in clause 4.6. Upon receiving written notice of any such assignment, Acclaim shall pay such royalties to F4G and to Juice.

12.    **Notices**

12.1    Any notice to a party under this Agreement shall be in writing and signed by or on behalf of the party giving it and shall be served on a party if given personally, left at or sent by prepaid first class post or prepaid recorded delivery or special delivery to the address of that party set out on page 1 of this Agreement (or such other address as may be notified in accordance with this clause).

12.2    Except as provided in clause 12.3, a notice shall be deemed to have been served at the time of delivery if delivered personally, 5 days after posting if delivered by post. However, where the deemed time of service is after 6 p.m. on a Business Day or on a day that is not a Business Day, the notice shall be served at 9 a.m. on the next Business Day.

12.3    The deemed service provisions of clause 12.2 shall not apply to notices served by post if there is a national or local disruption of postal services that affects the giving of the notice.

12.4    Without prejudice to the right of any party (other than Acclaim) to serve any process directly on Acclaim, any process issued out of the Courts of England to be served on Acclaim in relation to or in connection with this Agreement may be served on Acclaim by prepaid registered post to the address of Acclaim set out on page 1 of this Agreement (or such other address as may be notified in accordance with this clause).

13.    **General**

13.1    ***Entire Agreement***

        (a)    This Agreement, the Development Agreement, the Ancillary Agreement and the Development Services Agreement set out the entire agreement and understanding between the parties relating to the transactions contemplated by or the subject

matter of this Agreement and supersede all prior agreements, understandings or arrangements (whether oral or written) in respect of the subject matter of this Agreement.

(b)     Each of the parties acknowledge that they have entered into this Agreement in reliance only on the representations, warranties and promises specifically contained or incorporated in this Agreement, the Development Agreement and the Development Services Agreement and, save as expressly set out in this Agreement, the Development Agreement and the Development Services Agreement none of the parties shall have liability in respect of any other representation, warranty or promise made prior to the date of this Agreement unless it was made fraudulently.

13.2    *Variation*

No addition to or modification of any provision of this Agreement shall be binding upon the parties unless made by a written instrument signed by a duly authorised representative of each of the parties.

13.3    *No Waiver*

No failure on the part of any party to exercise or to enforce any right given to it by this Agreement or at law or any custom or practice of the parties at variance with the terms of this Agreement shall constitute a waiver of that party's respective rights under this Agreement or operate so as to prevent the exercise or enforcement of any such right at any time.

13.4    *Limitation*

No party shall be liable to another party for any incidental, consequential, special, or punitive damages of any kind or nature, including, without limitation, loss of profit or damage to goodwill or reputation arising from the breach of this Agreement or any termination of this Agreement or otherwise, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if any other party has warned or been warned of the possibility of any such loss or damage.

13.5    *Value Added Tax*

All sums due under this Agreement are exclusive of any applicable Value Added Tax or other sales tax.  Each party shall pay any applicable Value Added Tax or other sales tax with the relevant sum at the rate and in the manner from time to time prescribed by law, subject to receiving an appropriate Value Added Tax invoice from the other party.

535147_2.DOC

### 13.6   *Counterparts*

This Agreement may be executed in any number of counterparts and by the parties on separate counterparts, but shall not be effective until each party has executed at least one counterpart.  Each counterpart, when executed, shall be an original of this Agreement and all counterparts shall together constitute one instrument.

### 13.7   *Third Party Rights*

No term of this Agreement is enforceable pursuant to the Contracts (Rights of Third Parties) Act 1999 by any person who is not a party to it, but this does not affect any right or remedy which exists or is available otherwise than pursuant to this Act.

### 13.8   *Inconsistency*

In the event of any inconsistency between the terms of this Agreement and the Development Agreement or the Development Services Agreement, then the terms of this Agreement shall prevail.

### 13.9   *Law and Jurisdiction*

This Agreement is governed by English law and the parties submit for all purposes in connection with this Agreement to the non-exclusive jurisdiction of the English courts.

**This Agreement** has been executed on the date appearing at the beginning of this Agreement.


**F4G Software Limited**

Signed _____

Print name ___C.N.McMicking___

Title _____DIRECTOR._____


**Juice Games Limited**

Signed _____

Print name ___COLIN BELL___

Title ___MD___


**F4G Development 2 LLP**

Signed _____

Print name ___TIMOTHY GATLAND___

Title _____


**Acclaim Entertainment, Inc.**

Signed _____

Print name ___GERARD F. AGOGLIA___

Title ___EVP + CFO___

17                                    535147_2.DOC

**Schedule 1**

**The Project Management Services**

1.    **Project Planning and Implementation**

1.1    Prior to the date of this Agreement, F4G has:

(a)    planned the development schedules and milestone schedules in order to create the Milestone Schedule; and

(b)    investigated the technical and operational risks relating to the Project and created a monitoring and management structure in order to track those risks.

1.2    During the Project, F4G shall:

(a)    monitor and measure the progress of the Project;

(b)    assess each Milestone Deliverable to determine whether or not to approve that Milestone Deliverable based on the criteria and within the time scales specified in Paragraph 2(d) of the Development Agreement;

(c)    liaise with Juice and Acclaim in connection with any Technical Dispute (as defined in paragraph 1 of Schedule 3) that may arise in connection with the approval of a Milestone Deliverable based on the criteria specified in Paragraph 2(d) of the Development Agreement;

(d)    liaise with Acclaim in relation to the progress of the Project and the general quality and content of the Game and each of the Versions;

(e)    manage with Juice in accordance with the provisions of the Development Agreement any change in requirements of Acclaim and if appropriate plan any necessary changes to the Project; and

(f)    create and manage rectification processes for any elements of the Project that do not proceed in accordance with the plans underlying the Milestone Schedule.

2.    **Problem Management and Resolution**

2.1    If Juice fails to meet its obligations under the Development Services Agreement and such failure has not been caused as a direct result of a breach by F4G, Acclaim or the LLP of the Development Agreement or this Agreement, then F4G shall endeavour to remedy those problems.

2.2    In order to remedy any problems referred to in paragraph 2.1 of this Schedule, that arise in connection with the Project, F4G shall:

(a)    in the case of minor problems, endeavour to reorganise the schedules of work or Milestone Deliverables within the parameters permitted by the Development Agreement and the Development Services Agreement;

(b)    in the case of a more significant problem, contact Acclaim and work with Acclaim and Juice in order to endeavour to modify the specification of the Game, the Milestone Schedule or any other aspects of the Project; and

(c)    in the case of serious problems, consider the appointment of additional individuals to work on the Project (in accordance with clause 6).

535147_2 DOC

## Schedule 2

## Calculation of Actual Cost

1.    **Introduction**

1.1    The Licence Fee applicable to each Version, the proportion of the Project Budget applicable to each Version and the approximate percentage of the total Project Budget that is represented by the Project Budget applicable to each Version is as follows:

| Version | Licence Fee | Project Budget | % of Project Budget |
|---|---|---|---|
| Sony PlayStation 2 | £1,419,000 | £1,185,000 | 60% |
| Microsoft Xbox | £473,000 | £395,000 | 20% |
| PC | £473,000 | £395,000 | 20% |
| TOTAL | £2,365,000 | £1,975,000 | 100% |

1.2    The Licence Fee applicable to each Version has been calculated by reference to the following elements:

(a)    the Advances;

(b)    the Project Management Fees;

(c)    interest on the amount of the Advances and Project Management Fees paid by F4G to the LLP during the Project at the rate of 10.5% per annum, calculated on a daily basis;

(d)    an arrangement fee of £79,000 (being 4% of the Project Budget);

(e)    a commitment fee calculated every three months during the Project (with the first three months commencing on 1 October 2003) at the rate of 1% per annum on the balance of the Project Budget after deduction of the amount of the Advances and Project Management Fees paid or payable by F4G during the Project; and

(f)    the Expenses.

535147_2 DOC

2.      **Calculation of the Actual Cost of an Individual Version**

Where this Agreement requires the calculation of the Actual Cost of any individual Version at any time before the completion of the Project, then the Actual Cost of that Version shall be calculated by adding together:

(a)      all of the Advances paid or due in respect of that Version;

(b)      all of the Project Management Fees paid or due in respect of that Version;

(c)      all accrued interest (calculated pursuant to paragraph 1.2 of this Schedule) in respect of the Advances and Project Management Fees; and

(d)      X% of the aggregate of the arrangement fee set out in paragraph 1.2(d) of this Schedule, the commitment fee calculated in accordance with paragraph 1.2(e) of this Schedule, and the Expenses, where X is the percentage of the Project Budget applicable to the relevant Version as set out in the table in paragraph 1.1 of this Schedule.

535147_2 DOC

## Schedule 3

## The Development Agreement

1.    **Approval of Milestone Deliverables**

1.1    Each Milestone Deliverable shall also be subject to approval by F4G (based on the same criteria and time scales as Acclaim as set out in Paragraph 2(d) of the Development Agreement). Once F4G and Acclaim have approved a Milestone Deliverable, then neither party may subsequently withdraw such approval. However, such approval shall not relieve the LLP of its obligation to continue to provide conforming Milestone Deliverables or release the LLP from its obligation to comply with the agreed specifications for each Milestone Deliverable or restrict or prevent the rights of F4G or Acclaim in respect of the development or approval of any subsequent Milestone Deliverable.

1.2    If there is any dispute between Acclaim and F4G or between Acclaim and the LLP as to whether a Milestone Deliverable meets the relevant criteria (a **"Technical Dispute"**), then Acclaim, F4G or Juice may submit that Technical Dispute to an independent third party technical expert reasonably acceptable to Acclaim, Juice and F4G (the **"Technical Expert"**) for final determination in accordance with the procedure set out in paragraphs 1.3 – 1.8 of this Schedule.

1.3    If Acclaim, F4G or the LLP wish to submit a Technical Dispute for determination, it shall give the others written notice setting out a summary of the Technical Dispute and its opinion as to how that dispute should be resolved (a **"Technical Dispute Notice"**).

1.4    If, within 3 Business Days of receiving a Technical Dispute Notice, the Technical Dispute has not been resolved, then any of Acclaim, F4G or the LLP may submit that Technical Dispute Notice to the Technical Expert with a request that the Technical Expert make a final determination in relation to that Technical Dispute and the responsibility for the payment of their costs in relation to the determination of that Technical Dispute as soon as possible and in any event within 21 days.

1.5    Each of Acclaim, F4G and Juice shall promptly provide the Technical Expert with such assistance and information as the Technical Expert may require in connection with the determination of the Technical Dispute.

1.6    The Technical Expert's decision shall be final and binding on the parties except in the case of manifest error.

535147_2.DOC

1.7     If Acclaim, Juice and F4G are unable to agree upon who to act as Technical Expert within 5 days of a request from any party to do so or if the Technical Expert is unable or unwilling to accept the request to determine the Technical Dispute within the time period set out in paragraph 1.4 of this Schedule, then Acclaim, F4G or the LLP may request the Chairman of The Independent Game Developers Association ("**TIGA**") (or if there is no Chairman the CEO of TIGA) to nominate a person to act as Technical Expert to whom the Technical Dispute should be referred.

1.8     If the Technical Dispute is determined in favour of F4G or the LLP, then for the purpose of the Development Agreement and the Development Services Agreement, each day between the end of the Acceptance Period (as defined in Paragraph 2(d) of the Development Agreement) and the resolution or determination of the Technical Dispute shall constitute an Extra Day (as defined in Paragraph 2(m) of the Development Agreement).  If the Technical Dispute is determined in favour of Acclaim, then these days shall not constitute Extra Days.

2.      **Third Party Agreements**

2.1     The rights for Juice in this Agreement, the Development Agreement or the Development Services Agreement to enter into a Third Party Agreement shall be subject to the provisions of paragraphs 2.2 – 2.6 of this Schedule.

2.2     Before concluding a Third Party Agreement, Juice shall obtain the approval of F4G of the identity of that third party and the commercial terms of the proposed Third Party Agreement (not to be unreasonably withheld).

2.3     Upon giving its approval to Juice entering into a Third Party Agreement, F4G shall use all reasonable commercial endeavours to procure the irrevocable and unconditional releases of the security under the BoS Charge and Debenture and, so far as it is reasonably able to do so, shall do any other act or execute any other document reasonably necessary to enable Juice to enter into that Third Party Agreement. Juice shall reimburse F4G in respect of any reasonable costs incurred by F4G in connection with assisting Juice to enter into a Third Party Agreement.

2.4     Other than in circumstances set out in paragraph 2.5 of this Schedule, whereby Acclaim shall make payment of the Termination Payment pursuant to paragraph 2.1 of Schedule 4, Juice shall pay to F4G all sums that Juice receives under that Third Party Agreement in respect of the applicable Version(s) until it has refunded F4G a sum equal to the amount of the Actual Cost of the relevant Version(s) (unless and to the extent that Juice has already repaid F4G in respect of the Actual Cost of the relevant Version(s) pursuant to any other reimbursement obligation of Juice under this Agreement).

2.5    If Juice became entitled to enter into that Third Party Agreement in respect of the applicable Version upon Acclaim terminating the Development Agreement under Paragraph 12(b) of the Development Agreement, then Juice shall pay to Acclaim all sums that it receives in respect of that Third Party Agreement in respect of the applicable Version until Juice has paid to Acclaim a sum equal to that amount of the Termination Payment (as defined in paragraph 2.1 of Schedule 4) that Acclaim paid to the LLP which represents the amount of Project Budget paid by Acclaim in respect of the relevant Version(s) under paragraph 2.1 of Schedule 4.

2.6    Juice shall pay F4G a continuing royalty in respect of all sums that Juice receives under that Third Party Agreement in respect of the applicable Version(s) in excess of any sum equal to payments to F4G or Acclaim pursuant to paragraphs 2.4 and 2.5 of this Schedule, at the following rates:

(a)    3% if Juice exercised its right to enter into the Third Party Agreement prior to Juice delivering the first Milestone Deliverable for the relevant Version(s) to the LLP or Acclaim;

(b)    5% if Juice exercised its right to enter into the Third Party Agreement after Juice had delivered the Alpha Code (as defined in the Development Agreement) to the LLP or Acclaim; and

(c)    between 3% and 5% if Juice exercised its right to enter into the Third Party Agreement  at any time between the two events referred to in paragraph 2.6(a) and (b) of this Schedule, calculated pro rata to the number of Milestone Deliverables that Juice had delivered prior to Juice exercising its right to enter into the Third Party Agreement.

## Schedule 4

## Termination of the Development Agreement and/or the Development Services Agreement

1.      **Breach by Juice or the LLP**

1.1     If Acclaim terminates the development of a Version in accordance with Paragraph 11(e) or Paragraph 12(a) of the Development Agreement or terminates the Development Agreement in accordance with Paragraph 11(e) or Paragraph 12(a) of the Development Agreement (which breach has been caused as a direct result of any breach by Juice of the Ancillary Agreement or the Development Services Agreement), then F4G subject to paragraph 4.2 of Schedule 5 may upon written notice to Juice take over the development and exploitation of one or more of the Version(s) affected by that termination within the period of 10 Business Days following the date of that termination.   For the avoidance of doubt, this paragraph 1.1 shall not limit or restrict Acclaim's right to terminate the development of a Version or to terminate the Development Agreement in accordance with Paragraph 11(e) or Paragraph 12(a) of the Development Agreement.

1.2     If F4G does not elect to take over the development and/or exploitation of one or more of the Version(s) affected by that termination within the period of 10 Business Days following the date of that termination, then:

(a)     Juice shall pay F4G the Actual Cost applicable to the Version(s) that F4G does not elect to take over as at the time of termination;

(b)     the LLP may terminate the Development Services Agreement in respect of the Version(s) that F4G does not elect to take over; and

(c)     Juice may enter into a Third Party Agreement in respect of the Version(s) that F4G does not elect to take over subject to the terms of paragraph 2 of Schedule 3.

2.      **Discontinuance or Abandonment**

2.1     If Acclaim terminates the development of a Version pursuant to Paragraph 12(b) of the Development Agreement or terminates the development of all of the Versions by terminating the Development Agreement pursuant to Paragraph 12(b) of the Development Agreement, then within 5 Business Days following such termination, Acclaim shall pay to the LLP (and the LLP shall immediately pay to

535147_2.DOC

F4G) the following sums in respect of the Version(s) the development of which has been terminated:

(a)     the Actual Cost applicable to the relevant Version upon termination of the development of that Version; and

(b)     an amount corresponding to X% of the next payment in the Milestone Schedule after the last payment that was made prior to such termination, where X is the percentage of the Project Budget applicable to the relevant Version as set out in the table in paragraph 1.1 of Schedule 2 (the "**Termination Payment**").

2.2     If, upon the termination of the development of a Version or the termination of the Development Agreement in the circumstances described in paragraph 2.1 of this Schedule, the Advances paid by F4G in respect of that Version are less than the aggregate of the payments set out in the Milestone Schedule in respect of Milestone Deliverables that have been approved by Acclaim (or deemed to be approved under Paragraph 2(d)) prior to such termination, then for the purpose of calculating the Actual Cost of a Version under paragraph 2.1 of this Schedule, the Advances shall be deemed to be the sum of those payments.  In addition, for the purpose of calculating the Actual Cost of that Version, the Project Management Fees shall be calculated on the basis of that higher figure.

2.3     Within the period of 10 Business Days following the date on which Acclaim terminates the Development Agreement or the development of a Version, F4G subject to paragraph 4.2 of Schedule 5 may upon written notice to Juice take over the development and exploitation of one or more of the Version(s) affected by that termination.

2.4     If F4G takes over the development and exploitation of one or more of the Versions under paragraph 2.3 of this Schedule, then F4G shall pay to Acclaim all sums that it receives in respect of the exploitation of such Version(s) until F4G has repaid to Acclaim the sums paid by Acclaim to the LLP in respect of such Version(s) referred to under paragraph 2.1 of this Schedule.

2.5     If F4G does not elect to take over the development of a Version(s) affected by that termination within the period of 10 Business Days referred to in paragraph 2.3 of this Schedule, then without relieving F4G of its obligation to pay the LLP and the LLP of its obligation to pay Juice in respect of Milestone Deliverables that have been approved by Acclaim and F4G (or deemed to be approved under this Agreement):

(a)     Juice may enter into a Third Party Agreement in respect of the Version(s) that F4G does not elect to take over, subject to the terms set out in paragraph 2 of Schedule 3;

(b)      the LLP or Juice may terminate the Development Services Agreement in respect of the Version(s) that F4G does not elect to take over; and

(c)      F4G shall pay to Juice the Termination Payment in respect of the Version(s) that F4G does not elect to take over, together with any existing unpaid Advances due to Juice under this Agreement in respect of approved Milestone Deliverables.

3.      **Events of Insolvency**

3.1      Acclaim may not exercise its right to terminate the Development Agreement upon an Insolvency Event in respect of the LLP or Juice for a period of 10 Business Days from the point at which Acclaim could exercise that right under the terms of the Development Agreement.

3.2      During the period of 10 Business Days referred to in paragraph 3.1 of this Schedule, F4G may upon written notice to Juice elect to take over the development of one or more of the Versions.  If F4G elects to take over the development of a Version, then notwithstanding any provision to the contrary in the Development Agreement, Acclaim may not exercise its right to terminate the Development Agreement in respect of that Version.

3.3      If within the period of 10 Business Days referred to in paragraph 3.1 of this Schedule, F4G takes over the development of one or more of the Versions, Acclaim shall accept delivery of the Versions that F4G takes over, provided in each case that it meets the same criteria as those set out in the Development Agreement and that it is delivered within 60 days of the scheduled delivery date set out in the Development Agreement.  Once F4G has received from Acclaim or has recouped from an alternative publisher a sum equal to the Actual Cost in respect of the particular Version(s) which has been paid by Juice under paragraph 3.4(a) of this Schedule, F4G shall then repay to Juice the sum paid by Juice to F4G under paragraph 3.4(a) of this Schedule.

3.4      If F4G does not elect to take over the development of any of the Versions within the period of 10 Business Days referred to in paragraph 3.1 of this Schedule, then Acclaim may terminate the Development Agreement.  If Acclaim terminates the Development Agreement following the occurrence of an Insolvency Event in respect of Juice:

(a)      within 5 Business Days of the date on which Acclaim terminates the Development Agreement, Juice shall pay F4G the Actual Cost applicable to the Version(s) that F4G does not elect to take over as at the time of termination;

(b) the LLP may terminate the Development Services Agreement in respect of the Version(s) that F4G does not elect to take over; and

(c) Juice may enter into a Third Party Agreement in respect of the Version(s) that F4G does not elect to take over subject to the terms of paragraph 2 of Schedule 3.

3.5 Upon an Insolvency Event in respect of Acclaim prior to the completion of the Project, then:

(a) within 5 Business Days following the occurrence of the Insolvency Event, Acclaim shall pay F4G the Actual Cost in respect of the Version(s) then in development;

(b) F4G may, take over the development and exploitation of one or more of these Version(s) within 10 Business Days following the occurrence of the Insolvency Event; and

(c) if F4G does not elect to take over the development of any of the Versions within such period of 10 Business Days, then;

(i) the LLP or Juice may terminate the Development Services Agreement in respect of the Version(s) that F4G does not elect to take over; and

(ii) Juice may enter into a Third Party Agreement in respect of the Version(s) that F4G does not elect to take over subject to the terms set out in paragraph 2 of Schedule 3.

## 4. Events of Default

4.1 If an Event of Default occurs prior to the completion of the Project, then within 10 Business Days following the occurrence of that Event of Default, F4G may upon written notice to Juice and without prejudice to its other rights under this Agreement, take over the development of one or more of the Versions.

4.2 If within the period of 10 Business Days referred to in paragraph 4.1 of this Schedule, F4G takes over the development of one or more of the Versions, Acclaim shall accept delivery of the Versions that F4G takes over (provided in each case that it meets the same criteria as those set out in the Development Agreement and that it is delivered within 60 days of the scheduled delivery date set out in the Development Agreement.

4.3 If F4G does not elect to take over the development of any of the Versions within the period of 10 Business Days referred to in paragraph 4.1 of this Schedule, then:

(a)     the LLP may terminate the Development Services Agreement in respect of the Version(s) that F4G does not elect to take over;

(b)     within 5 Business Days of the expiry of that period, Juice shall pay F4G the Actual Cost in respect of the Version(s) that F4G does not elect to take over; and

(c)     Juice may enter into a Third Party Agreement in respect of the Version(s) that F4G does not elect to take over, subject to the terms set out in paragraph 2 of Schedule 3.

5.      **F4G Default or Insolvency**

5.1     In this Agreement, the words, "**F4G Default or Insolvency Event**" means where:

(a)     F4G fails to pay any amount of the Project Budget which is not the subject of any bona fide dispute on the due date pursuant to clause 3.1(a) and fails to remedy such non-payment within 30 days after receipt of a written notice from Juice requiring it to pay such amount; or

(b)     an administrative receiver is appointed in respect of the business and assets of F4G and is not removed or discharged within 14 days ; or

(c)     an order is made by a court of competent jurisdiction for the compulsory winding up of F4G.

5.2     If an F4G Default or Insolvency Event occurs prior to the completion of the Project, then:

(a)     this Agreement shall terminate with immediate effect and, except as provided in paragraph 5.5 of this Schedule, all rights and obligations of F4G, Juice, the LLP and Acclaim under this Agreement shall immediately cease to have effect;

(b)     the Development Services Agreement shall terminate with immediate effect and, except as provided in paragraph 5.5 of this Schedule, all rights and obligations of Juice, the LLP and F4G under the Development Services Agreement shall immediately cease to have effect;

(c)     Juice shall take over the rights and obligations of the LLP under the Development Agreement on the same terms as the Development Agreement ("**the Juice Development Agreement**"), save that the obligations of Acclaim to pay the LLP the License Fees in the amount and manner provided by Paragraph 5(a) of the Development Agreement shall be replaced by Acclaim agreeing to pay to Juice directly the

balance of the then outstanding amounts of the Project Budget against the remaining Milestone Deliverables set out in Schedule 7 at the time of the termination of this Agreement; and

(d)     provided that F4G can obtain a deed of release and letter of non-crystallisation from BoS in relation to the BoS Charge and Debenture (if applicable), Acclaim shall pay to F4G a sum equal to all sums then due by F4G to BoS under the BoS Facility Letter (if any) ("**the BoS Indebtedness**") and F4G shall promptly:

      (i)     use this sum to discharge promptly the BoS Indebtedness; and

      (ii)    use all reasonable endeavours to assist the LLP to obtain the deed of release and letter of non-crystallisation from BoS referred to in this paragraph 5.2(d); and

(e)     provided that F4G obtains the deed of release and letter of non-crystallisation from BoS referred to in paragraph 5.2(d) (if applicable), Acclaim shall also pay to F4G a sum equal to the difference between the BoS Indebtedness and the amount of the Project Budget paid by F4G pursuant to this Agreement prior to the date of termination of this Agreement ("**the Balancing Payment**") in accordance with paragraph 5.4 of this Schedule 4.

5.3     Upon F4G obtaining the deed of release and letter of non-crystallisation from BoS referred to in paragraph 5.2(d) (if applicable):

(a)     the LLP shall assign to Juice all right, title and interest past and present in and to all Intellectual Property Rights in the Game Materials and the Game Names assigned to the LLP pursuant to the Development Services Agreement, together with any registrations (or applications for registrations) or any such Intellectual Property Rights that are in the name of LLP; and

(b)     following the completion of the assignment referred to in paragraph 5.3(a) of this Schedule, Juice shall be entitled to wind up the LLP.

5.4     Provided that F4G obtains the deed of release and letter of non-crystallisation from BoS referred to in paragraph 5.2(d) (if applicable), Acclaim shall pay to F4G the Balancing Payment upon the occurrence of the first of the following events:

(a)     Acclaim terminates the Development Agreement (or terminates the development of any Version) pursuant to Paragraphs 11(e), 12(a) or 12(d) of the Development Agreement; or

(b)     Acclaim terminates the Development Agreement (or terminates the development of any Version) pursuant to Paragraph 12(b) of the Development Agreement; or

(c)     Acclaim (or a sub-licensee of Acclaim) publishes any Version; or

(d)     the expiry of 3 months from the delivery date applicable to the final milestone as set out in the Milestone Schedule as at the date of this Agreement (or any alternative delivery date applicable to that milestone that the parties to this Agreement may have agreed prior to the termination of this Agreement).

5.5     The termination of this Agreement and the termination of the Development Services Agreement pursuant to paragraph 5.2(a) of this Schedule, and paragraph 5.2(b) of this Schedule, respectively shall not affect any accrued rights and obligations of the parties to this Agreement and the parties to the Development Services Agreement respectively as at the date of such termination, nor shall it affect the coming into or continuation in force of any other provision of this Agreement and the Development Services Agreement which is expressly or by implication intended to come into force or continue in force on or after termination.

5.6     The LLP hereby irrevocably appoints Juice to be its attorney in its name and on its behalf to do and execute all acts, deeds, matters and things and generally to use of the purpose of giving to Juice the full benefit of the provisions of paragraph 5 of this Schedule 4 and in favour of any third party a certificate in writing signed by any director of Juice that any instrument or acts falls within the authority hereby conferred shall be conclusive evidence that such is the case.

5.7     Except as expressly provided in this Schedule 4, F4G shall have no liability to Juice, the LLP or Acclaim in respect of any F4G Default or Insolvency Event.

6.      **General**

6.1     If other than pursuant to paragraph 5 of this Schedule 4 the LLP becomes entitled to terminate the Development Agreement or the Development Services Agreement or becomes entitled to terminate the development of one or more of the Versions under the Development Agreement or the Development Services Agreement, then the LLP shall (or shall not) exercise that right in accordance with the written directions of F4G. Juice shall at the request of F4G take such steps and execute such documents as F4G may reasonable require in order to give effect to or to confirm any such directions. F4G shall reimburse Juice for all reasonable costs incurred by Juice in complying with any such directions.

6.2    Before giving any written directions in respect of the termination of the Development Agreement or termination of the development of one or more of the Versions under the Development Agreement, F4G shall so far as it is reasonably possible to do so, consult with Juice and take reasonable account of any views expressed by Juice.

535147_2.DOC

**Schedule 5**

**Exercise of Rights of Take Over**

1.    **Use of Intellectual Property Rights and Acclaim Tools**

1.1    Without limitation to the terms of this Agreement and the Development Services Agreement, the LLP may use (and may sub-licence the use of) the intellectual property rights in the Game, the Engine (as defined in the Development Agreement) and the Subroutine Technology (as defined in the Development Agreement) solely for the purpose of, where the Development Services Agreement has been terminated, completing the development of the Versions and where the Development Agreement has been terminated exploiting the Versions in each case upon the terms of the Development Agreement.

1.2    The LLP shall grant F4G a licence to use (and may sub-licence the use of) the intellectual property rights in the Game, the Engine (as defined in the Development Agreement) and the Subroutine Technology (as defined in the Development Agreement) solely for the purposes referred to in paragraph 1.1 of this Schedule.

1.3    Acclaim grants F4G and the LLP a licence to use (and sub-licence the use of) the Acclaim Tools (as defined in the Development Agreement) for the purpose of completing the development of the Versions and exploiting the Versions.

2.    **Development Procedures**

2.1    If Juice wishes to use or incorporate any third party intellectual property rights (other than any intellectual property rights owned by any Group Company) or any Third Party Utilities (as defined in the Development Agreement) in the Versions (other than any Third Party Materials that may be listed in Schedule E to the Development Agreement or are included or used in Versions at the request of F4G, or the LLP (in circumstances where the request is given to the LLP by F4G) or any manufacturer or licensor of any console platform such as Sony or Microsoft), then Juice must obtain the prior written approval of F4G (in addition to any approval that may be required by Acclaim under the Development Agreement) based on the terms and criteria of the Development Agreement.

2.2    Upon delivery of a Milestone Deliverable, Juice shall also deliver a copy of that Milestone Deliverable to F4G. Within 10 Business Days following the delivery of a Milestone Deliverable to F4G, Juice shall deliver to F4G a complete copy of all source code relating to that milestone for the purposes of completing the development of the applicable Versions if the Development Services Agreement has been terminated and exploiting the applicable Version if the Development

535147_2.DOC

Agreement has been terminated in each case upon the terms of the Development Agreement.   Juice shall also provide F4G with a complete copy of the source code of a Version upon request for the purpose of completing the development of the applicable Version if the Development Services Agreement has been terminated and exploiting the applicable Version if the Development Agreement has been terminated in each case upon the terms of the Development Agreement.

3.     **Problem Resolution**

Prior to F4G taking over the development of a Version under Schedule 4, it shall where reasonably possible first endeavour to resolve the problems that have arisen with the development project in the manner outlined in clause 6.

4.     **Consequences of Exercise of Rights of Take Over**

4.1    If F4G exercises its right to take over the development and/or exploitation of a Version, then the consequences shall be those set out in paragraphs 4.2- 4.8 of this Schedule.

4.2    F4G undertakes that, except where F4G has exercised its right to take over the development of a Version pursuant to paragraph 1 of Schedule 4 (as a result of a breach of the Development Agreement by the LLP) or pursuant to paragraph 3 of Schedule 4 (as a result of an Insolvency Event in respect of Juice) or pursuant to paragraph 4 of Schedule 4 (as a result of the occurrence of an Event of Default:

       (a)     F4G shall procure that it and the LLP continue to engage the services of Juice in respect of that Version upon the terms of the Development Services Agreement (including, without limitation, the financial terms of the Development Services Agreement and this Agreement); and

       (b)     F4G shall not be entitled to terminate and shall not authorise the LLP to terminate and the LLP agrees not to terminate the Development Services Agreement in respect of that Version as a consequence of F4G exercising its right to take over the development of that Version.

4.3    If F4G exercises its right to take over the development of a Version pursuant to paragraph 3 of Schedule 4 (as a result of an Insolvency Event in respect of Juice) or pursuant to paragraph 4 of Schedule 4 (as a result of the occurrence of an Event of Default), then F4G shall be entitled, on behalf of the LLP, to expel Juice from the LLP pursuant to clause 15.1 of the Members Agreement.

4.4    If F4G exercises its right to take over the development of a Version pursuant to paragraph 2 of Schedule 4 (as a result of a breach of the

Development Agreement by the LLP) or pursuant to paragraph 3 of Schedule 4 (as a result of an Insolvency Event in respect of Juice) or pursuant to paragraph 4 of Schedule 4 (as a result of the occurrence of an Event of Default), then:

(a)   Juice shall deliver to F4G (rather than to Acclaim) a copy of the Acclaim Tools and any equipment loaned by Acclaim to the LLP under the Development Agreement (and therefore to Juice under the Development Services Agreement) in respect of that Version (and Acclaim confirms that Juice may do so);

(b)   upon making such delivery, Juice shall have no further obligations in respect of the development of that Version;

(c)   the LLP may terminate the Development Services Agreement in respect of that Version; and

(d)   Juice shall at the request of F4G use all reasonable endeavours to transfer to F4G (or, at the direction of F4G, to the LLP) all licences and other rights acquired by Juice in respect of the Third Party Utilities (as defined in the Development Agreement).

4.5   If F4G exercises its rights to take over the development and/or exploitation of a Version and the Development Agreement has not been terminated in respect of the relevant Version, then F4G shall be entitled to assume the rights and obligations of the LLP in place of the LLP in respect of that Version under the Development Agreement.

4.6   If F4G exercises its rights to take over the development and/or exploitation of a Version and the Development Agreement has been terminated in respect of the relevant Version, then:

(a)   F4G shall be entitled to:

(i)   exploit the rights in respect of that Version that the LLP granted to Acclaim under the Development Agreement (and Juice granted to the LLP under the Development Services Agreement) upon the terms of the Development Agreement (and grant a licence to other persons to do so); and

(ii)   deduct from the sums it receives in respect of the exploitation of that Version;

(A)   the Actual Cost in respect of the applicable Version (unless and to the extent that it has received that Actual Cost from Acclaim or Juice); and

        (B)     the costs and expenses incurred in completing itself or engaging any third party to complete and exploiting that Version; and

(b)     Acclaim shall at the request of F4G use all reasonable endeavours to transfer to F4G (or, at the direction of F4G, to the LLP) the Automobile Clearances (as defined in Paragraph 4(d) of the Development Agreement) in respect of that Version.

4.7     If F4G exercises its right to exploit any rights in respect of the applicable Version, and such rights have been exercised pursuant to paragraph 1 of Schedule 4, (as a result of a breach of the Development Agreement by the LLP) or pursuant to paragraph 3 of Schedule 4 (as a result of an Insolvency Event in respect of Juice) or pursuant to paragraph 4 of Schedule 4 (as a result of the occurrence of an Event of Default) and the Development Services Agreement has been validly terminated in respect of that Version, then once it has repaid to Acclaim the Termination Payment paid by Acclaim to the LLP (referred to in paragraph 2.1(b) of Schedule 4 (if any) and recouped all of the sums referred to in paragraph 4.6(a)(ii) of this Schedule, it shall pay to Juice a royalty in respect of all sums received by F4G in respect of the exploitation of that Version at a percentage rate that fairly reflects the stage of development that had been reached by Juice before F4G itself took over the development of that Version (and the consequent level of risk undertaken by F4G) calculated as follows:

(a)     3% if F4G took over the development of that Version prior to Juice delivering the first Milestone Deliverable for the relevant Version to Acclaim or the LLP;

(b)     5% if F4G took over the development of that Version after Juice had delivered the Alpha Code (as defined in the Development Agreement) to Acclaim or the LLP; and

(c)     between 3% and 5% if F4G took over the development of that Version at any time between the two events referred to in paragraph 4.7(a) and 4.7(b) of this Schedule, calculated pro rata to the number of Milestone Deliverables that Juice had delivered prior to F4G taking over the development of that Version.

4.8     If F4G elects to take over the development of a Version Acclaim shall accept delivery of the Versions that F4G takes over (provided, in the case of each such Version, that it meets the same criteria as those set out in the Development Agreement and that it is delivered within 60 days of the scheduled delivery date set out in the Development Agreement.

**Schedule 6**

**Events of Default**

1.     **Events of Default**

1.1     Juice is in material breach (either by a single event or by cumulative non-material breaches which are together a material breach) of the Development Services Agreement, and fails to remedy that breach within 30 days after receipt of a written notice from F4G requiring it to remedy the breach.

1.2     Juice fails to make payment within the applicable period of time agreed from time to time of the due date for payment of any item of indebtedness in excess of £25,000, which is due and is not the subject of any bona fide dispute.

1.3     Any petition is presented or an order made or a resolution passed for the winding up Juice or if a notice is issued convening a meeting for the purpose of passing any such resolution (save for the purpose of and followed within four months by an amalgamation or reconstruction not involving or arising out of insolvency and on terms previously approved in writing by F4G) or if an Administration Order is made in respect of Juice.

1.4     An encumbrancer is entitled to and takes possession, or is entitled to and exercises any power of sale, or otherwise is entitled to and enforces its security or a receiver is appointed of the whole or any part of the undertaking property or assets of Juice and is not removed or discharged within 14 days.

1.5     Any judgment or order made against and served upon Juice is not complied with within seven days of the time for performance set out in such order or if an execution distress sequestration or other process is levied or enforced upon or against any material part of the undertaking, property or assets of Juice.

1.6     If a notice is validly issued convening a meeting of, or Juice proposes or enters into any formal composition or arrangement under the Insolvency Act 1986 with Juice's creditors generally or any class of its creditors.

1.7     Juice without the prior consent in writing of F4G ceases or threatens to cease to carry on its business or any material part of its business.

1.8     More than half of the individuals listed in section 1.1 of the Ancillary Agreement are made redundant within the meaning of the Employment Rights Act 1996 by the Group Companies (whether all at the same time

or in aggregate at different times) excluding any individual who is replaced by an individual approved by Acclaim and Juice in accordance with the Development Agreement and the Development Services Agreement respectively.

## Schedule 7

### Advances of the Project Budget

| Milestone Number | Payment (£) |
|---|---|
| Milestone 1 | £81,000 |
| Milestone 2 | £83,000 |
| Milestone 3 | £225,000 |
| Milestone 4 | £140,000 |
| Milestone 5 | £140,000 |
| Milestone 6 | £140,000 |
| Milestone 7 | £140,000 |
| Milestone 8 | £140,000 |
| Milestone 9 | £170,000 |
| Milestone 11 | £160,000 |
| Milestone 12 | £171,000 |
| Milestone 14 | £160,000 |
| Milestone 15 | £225,000 |
| TOTAL: | £1,975,000 |

Note:  Acclaim has paid Juice the payments in respect of milestones 1 and 2 and £100,000 in respect of milestone 3 (i.e. a total of £264,000) prior to the date of this Agreement.  F4G shall reimburse Acclaim in respect of such sum pursuant to clause 3.1.

**Stephen Groom**

| | |
|---|---|
| **From:** | Mark Webber |
| **Sent:** | 07 September 2004 10:45 |
| **To:** | Richard Brown; David Cubitt; Lloyd Davey; Vincent Galea; Emma Glass; Piers Leigh-Pollitt; Victoria Parry; Neil Bromwich; Dolf Darnton; Samantha Stokes; Patrick Dawe-Lane; Karen Vicary; David Cubitt; Stephen Groom; Karen Cooper; Lloyd Davey; Mairi Granville-George; Stephen Groom; Nick Johnson; Harry Parker; Kath Sadler-Smith; Theo Savvides |
| **Cc:** | Sally Clifford-Smith; Erin Stockham |
| **Subject:** | Netflix Inc to Netflix UK Limited |

Dear All

Many thanks for your ongoing support on the Netflix launch. As some of you are aware there has been some delay with Netflix in paying our outstanding bills. Much of this arose from the fact Netflix have asked OC to bill the UK entity and not Inc for the start-up work.

At the request of Netflix and in order to facilitate their accounting procedures, we have now transferred all open matters from Netflix Inc. to Netflix UK Limited (new client number: 028817) the matter numbers remain the same. One General file remains for Netflix Inc. In the future please open any new files or record your time to Netflix UK Limited unless you are specifically instructed to bill/invoice Netflix Inc..

Any questions please just shout

Regards

Webber

PS - Sally - UK will need an SVO code (but we've asked for one already)

Mark Webber
Associate

_____

## Osborne Clarke

Apex Plaza, Forbury Road, Reading, RG1 1AX, UK
direct dial: +44 (0)118 925 2138
direct fax: +44 (0)118 925 2139
e-mail: mailto:mark.webber@osborneclarke.com
or contact our web site: www.osborneclarke.com

Regulated by the Financial Services Authority for investment business

_____

-----Original Message-----

| | |
|---|---|
| **From:** | Erin Stockham |
| **Sent:** | 06 September 2004 13:51 |
| **To:** | Mark Webber |
| **Subject:** | Netflix Inc |

Mark,

Here's the list you asked for. I've looked on Elite and this appears to be everyone that has worked on Netflix, inc:

**Employment Advice - 0887135**

Richard Brown
David Cubitt
Lloyd Davey
Vincent Galea
Emma Glass
Piers Leigh-Pollitt
Victoria Parry

**Property Advice - 0886584**

Neil Bromwich
Dolf Darnton
Samantha Stokes
Trainee 1 Team 151

**Company Secretarial - 0886234**

Patrick Dawe-Lane
Karen Vicary

**UK Compliance Advice - 0886123**

David Cubitt
Stephen Groom
Trainee 1 Team 304

**General - 0885739**

Karen Cooper
Lloyd Davey
Mairi Granville-George
Stephen Groom
Nicholas Johnson
Harry Parker
Katherine Sadler-Smith
Theo Savvides
Trainee 2 Team 111
Trainee 4 LO
Trainee 1 Team 889
Trainee 3 LO
Mark Webber
**Erin**
x2120