UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x
In re:

ACCLAIM ENTERTAINMENT, INC.

               Debtor.
--------------------------------x

Return Date: November 16, 2005
Time:  1:00 P.M.

Chapter  7
Case No.8-04-85593-(MLC)

### APPLICATION OF HOFHEIMER GARTLIR & GROSS, LLP SPECIAL LITIGATION COUNSEL FOR THE TRUSTEE FOR ALLOWANCE OF FINAL COMPENSATION PURSUANT TO 11 U.S.C. § 330

**TO THE HONORABLE MELANIE CYGANOWSKI, BANKRUPTCY JUDGE:**

    HOFHEIMER GARTLIR & GROSS, LLP, Special Litigation Counsel to Alan Mendelsohn, the Chapter 7 Trustee of Acclaim Entertainment Inc. (Acclaim or Debtor), as and for its application for allowance of final compensation respectfully alleges:

    1.  That Gary B. Sachs, Esq. is a member of the firm of Hofheimer Gartlir & Gross, LLP, is duly admitted to practice before this Court, and is authorized to submit this application for allowances on behalf of said firm. A copy of our order of retention is annexed hereto as Exhibit "A".

## Prior Representation

2.    Prior to the Debtor's filing, Applicant had been previously retained by the Debtor and Annodeus Inc.("Annodeus")[1] to represent them in the liquidation of Annodeus' collateral in the Chapter 7 bankruptcy of HHG Inc. In January 2003, Applicant was also retained to institute a lawsuit ("Lawsuit") in the United States District Court for the Southern District of New York by Annodeus against certain defendants.[2]

3.    After the Debtor's filing all of the officers and directors of Acclaim and Annodeus resigned. The Trustee herein as the beneficial owner of the equity interest in Annodeus became the only individual who had authority to authorize, control, or direct the suit against the defendants. Applicant met with the Trustee and his counsel and negotiated our retention as special litigation counsel. This was done to prevent the lawsuit from being dismissed because no one was in a position to authorize its continuance.

## I.  LEGAL STANDING OF HOFHEIMER GARTLIR & GROSS, LLP

4.    In considering this Application, it should be noted that Hofheimer Gartlir & Gross, LLP has considerable experience in matters of this nature and has acted in a professional

---

[1] Annodeus Inc. is a wholly owned subsidiary of TNT Entertainment Inc., which in turn is wholly owned by the Debtor.
[2] Eugene Ciarkowski, Eugene R. Boffa, Jr., Steven Karel, ECW Management Group, and Boffa, Shalian, Cammarata & O'Connor, L.L.C.

capacity in numerous lawsuits involving complex litigation instituted in various Federal and State Courts. Applicant in other matters has represented in complex litigations the interests of Chapter 7 and Chapter 11 trustees, debtors, creditors, plaintiffs, and defendants.

5.    Having been directly involved in a substantial number of complex litigations in the Federal Courts in the Eastern and Southern Districts of New York, Hofheimer Gartlir & Gross, LLP has knowledge of and is familiar with the rates that are charged by other firms of similar reputation, quality, and expertise. Applicant points out that our hourly charges are in line with the hourly charges of the general bar in the New York metropolitan area.

## II.    FORMAT OF APPLICATION

6.    In order to clearly inform the Court of the extent, detail, and complexity of the services rendered, and for the Court to have an overall picture of Applicant's activities on behalf of the Debtor and Annodeus, we have set forth the details of our services under topical headings. Each of the topics is developed in summary fashion so that the narrative in each is complete.

7.    Applicant makes this application for an award of additional compensation in the sum of $300,000 for fees and

disbursements for the professional services rendered by us.  As per Applicant's agreement with the Trustee and with this Court's approval, two hundred thousand of any such award will be kept by Applicant and Applicant will remit the other $100,000 to the Trustee herein who will distribute same to creditors of the Debtor pursuant to a further order of this Court. The period covered by our services, runs from January 2002 through September 2005. Prior to the Debtor's filing, Applicant received from the Debtor for the lawsuit the sum of $25,000 for fees and disbursements as an initial retainer. Also, prior to the Debtor's filing and during the course of our representation, Applicant received an additional $17,500 for fees and disbursements. Pre-filing, Applicant applied the aforementioned $42,500 to its outstanding bills.

8.   The professional services for which allowances are sought by Applicant were rendered by Applicant on behalf of the Debtor, Annodeus and the Chapter 7 Trustee herein.  Hofheimer Gartlir & Gross, LLP has received no compensation for the professional services rendered in connection with the within lawsuit, except as set forth in this application.

9.   Applicant's firm maintains records of its time expended in the rendition of all professional services that were required by the Debtor and Annodeus. The firm's time records were made concurrently with the rendition of the professional

services. A summary of the hours worked by each professional and paraprofessional of the firm is set forth in Exhibit "B" annexed hereto. A complete record of the firm's time has been provided to the U.S. Trustee and the Chapter 7 Trustee. A copy of such time records may be obtained by any interested party upon request to Debtor's counsel, Hofheimer, Gartlir & Gross, LLP, 530 Fifth Avenue, New York, New York 10036, (212) 818-9000, Attn: Gary B. Sachs, Esq.

10. Applicant maintains regular records of its out-of-pocket expenses that were incurred on behalf of the Debtor and Annodeus. Applicant's record of disbursements is summarized on Exhibit "C" annexed hereto. Prior to the Debtor's filing on a regular basis Applicant sent the Debtor copies of its invoices for its services and disbursements. At the time of the Debtor's filing, after application of the aforementioned $42,500, Applicant was owed approximately $300,000 for fees and disbursements. Under New York Law and the Common Law Applicant has a charging and a retaining lien on the first proceeds recovered from the litigation up to the amount it is owed for its services and disbursement on the within matter. Applicant agreed to limit the amount of its lien in its retention agreement with the trustee to the sum awarded by this Court.

### III. **PREPARATION OF COMPLAINT**

#### A.  General

11.  Prior to preparing the Complaint, Applicant reviewed hundreds of documents, and had numerous communications with insiders of the Debtor and other third parties, to ascertain the relevant facts with reference to the Defendants' transactions with Annodeus and the Debtor.

#### B.   Relevant Facts Ascertained

12.  HHG Inc. was a corporation that did business as Extreme Championship Wresting ("ECW"), which was one of three nationwide wrestling concerns in 1999. In or around January 1999, representatives of Acclaim approached HHG about obtaining the license to produce an ECW wrestling video game. HHG was wholly owned by its founder, wrestling promoter Paul Heyman ("Heyman"), but Acclaim was told during these negotiations with Heyman that he had turned over control of HHG's business and finances to the ECW Management Group ("ECW Management") under the terms of a written Agreement. Applicant ascertained that ECW Management was a joint venture composed of Eugene Ciarkowski, Steven Karel, and Eugene Boffa. Boffa and Ciarkowski were also Partners in a Law Firm, BOFFA, SHALJIAN, CAMMARATA & O'CONNOR, LLC ("BSCO").

13. In or about April 1999, representatives of Acclaim requested that HHG provide it with financial information so that Acclaim could determine whether it would invest or loan money to HHG. On April 30, 1999, Ciarkowski, on behalf of ECW Management and HHG, sent a fax containing financial projections for HHG's performance for the remainder of 1999. Ciarkowski's forecast reflected a profit of $500,000, whereas HHG lost at least $2,500,000 during this period. Acclaim believed that ECW Management knowingly provided it with fraudulent projections in order to obtain financing for HHG. The April 30, 1999 fax was sent across state lines from New Jersey to New York.

14. Annodeus was a wholly owned subsidiary of TNT Ent. Inc., which in turn was wholly owned by Acclaim. Acclaim used Annodeus as the corporate vehicle, which did business with HHG. In July 1999, after a series of meetings, Annodeus and HHG entered into an agreement pursuant to which Annodeus acquired licensing rights to ECW's wrestling video game. Approximately a month later, Annodeus acquired a 15% equity interest in HHG in exchange for $1,500,000. Simultaneously, Annodeus made a $1,000,000 loan to HHG. The funds for the loan and the equity purchase were all provided to Annodeus by Acclaim.

15. In November of 1999, Acclaim and Annodeus were informed that HHG was having serious cash flow difficulties. In January 2000, Heyman and Ciarkowski requested an additional loan

of $175,000 and assured Annodeus that HHG was about to receive over $1,000,000 in proceeds from its airing of 3 wrestling shows on Pay-Per-View television, and that proceeds (the "PPV Proceeds") would be available for repayment of the loan in a few weeks. Annodeus subsequently wired $175,000 across state lines (New York to New Jersey) and HHG executed a Promissory Note ("Note") by which it agreed to repay the $175,000 principal together with interest at 10.5% per year, by February 10, 2000. The Note was also faxed across state lines (New York to New Jersey). The Funds for the Note were provided to Annodeus by Acclaim.

16.   In addition, Ciarkowski also arranged for Heyman to execute a Purchase and Sale Agreement ("Agreement") whereby HHG pledged as collateral for the loan a lien on all of HHG's PPV Proceeds. The Agreement represented and warranted that PPV Proceeds were not previously assigned or encumbered, that they were property of HHG, and that HHG could be subject to criminal liability for any misappropriation of the PPV Proceeds.

17.   In or about the week of February 7, 2000 James Scoroposki an insider of Acclaim and Annodeus, received another telephone call from Heyman and Ciarkowski that HHG again needed an additional $175,000 to meet its upcoming weekly payroll, as well as additional time to repay the $175,000 Note. Annodeus agreed to both of these requests. On February 11, 2000

Ciarkowski and Karel traveled to Acclaim's New York office, and Ciarkowski, as an authorized signatory of HHG, executed an amended and restated Promissory Note ("Second Note") by which he agreed to pay the principal sum of $350,000 with interest at 10.5% per year by June 30, 2000. Ciarkowski also executed a second Purchase and Sale Agreement ("Second Agreement"), which sold, transferred and assigned to Annodeus all of HHG's right, title and interest in the PPV Proceeds from the September 1999, November 1999, and January 2000 events. As before, HHG represented that the PPV Proceeds were not previously assigned or encumbered. Annodeus wired the $175,000 across state lines (New York to New Jersey), which funds were provided to it by Acclaim.

18. Annodeus also agreed to lend HHG another $175,000 on or about February 17, 2000 and a third note ("Third Note") was executed by Ciarkowski on behalf of ECW Management. As before, the Third Note, now for $525,000, sold, transferred and assigned all of HHG's right, title, and interest in the PPV Proceeds from the September 1999, November 1999 and January 2000 PPV events and warranted that the proceeds were not previously assigned or encumbered. The Third Note was also sent across state lines (New York to New Jersey). Applicant ascertained that Ciarkowski executed and delivered the Second and Third Notes with the authorization of Karel and Boffa, the other members of ECW

Management. Similarly, the additional funds for this Note were provided to Annodeus by Acclaim.

19. Contrary to representation in all three Notes, however, certain of the PPV Proceeds had already been sold to Quantum Corporate Funding, Ltd. ("Quantum"). Quantum was a company who financed HHG's PPV Events by factoring its PPV Proceeds. Applicant ascertained that contrary to the representations in all three Notes, a portion of the PPV Proceeds for the September and November Events had been sold to Quantum. Quantum had advanced to HHG $300,000 on the September Event and $275,000 on the November Event. Applicant also ascertained that Quantum never financed or advanced any funds on the January 2000 Event.

20. Applicant further ascertained that Ciarkowski controlled the deposits into and the disbursements from HHG's bank account. In fact, during the relevant period he was the only one who signed HHG's checks.

21. Applicant ascertained that in April 2000, the Defendants converted a $300,000 advance to HHG on its January 2000 Event. In addition, Ciarkowski paid Quantum three checks approximating $130,000 and paid other creditors of HHG approximately $400,000 from the proceeds of the aforementioned PPV Events. Annodeus believed that the above sums should have

been paid to it, and if paid, would have resulted in the $525,000 Note being paid in full.

C.    The HHG Settlement and Bankruptcy

22. In HHG's Chapter 7 Bankruptcy, Annodeus for its loans to HHG asserted a first lien on all of HHG's assets. In response, the Trustee of HHG asserted various defenses to Annodeus' lien. During HHG's bankruptcy a third party (WWF) purchased all of HHG's assets and paid Annodeus a sum for the termination of its license for the ECW wrestling game. In settlement of its lien rights, Annodeus received $1,700,000. In settlement of its license rights, Annodeus received $300,000. Annodeus was a guarantor of Acclaim's secured obligation to General Motors Acceptance Corporation ("GMAC") and the $2,000,000 received by Annodeus was remitted to GMAC to reduce its obligations and those of Acclaim to GMAC.

23. The $2,000,000 settlement was in full and complete satisfaction of any and all claims that Acclaim and Annodeus had against HHG, its officers, and directors. However, carved out of the settlement were certain Causes of Action that Annodeus had against the Defendants. The $1,700,000 that Annodeus received was applied by it to the $1,000,000 loan, which resulted in the $525,000 Note still being owed. Applicant and Sachs & Kamhi, P.C. represented Annodeus and Acclaim in recovering the

aforementioned $2,000,000 and they were paid in full for their services on this matter. None of the services or disbursements for which compensation is sought in this application is duplicative of our services for the collection of the aforementioned $2,000,000.

D.    <u>Preparation of Complaint</u>

24.    In January 2003, after ascertaining the above facts and having numerous communications with the Debtor's insiders, and its outside Counsel ("Bernard J. Fischbach"), Applicant was authorized and retained by Annodeus and Acclaim to prepare and file a Complaint in the United States District Court for the Southern District of New York against the aforementioned Defendants. In preparing the Complaint Applicant was required to prepare several drafts, which upon review by various parties, were amended several times. The initial Complaint in its final form encompassed Causes of Action for RICO, Fraud, Negligence, Conversion of Collateral, and Breach of Fiduciary Duty. The Complaint requested Damages on its Causes of Action between $1,000,000 and $3,000,000 (RICO).

25.    Once the Complaint was in final form, Applicant prepared a summons and caused the documents to be served upon the Defendants. Then Applicant prepared and filed the appropriate Affidavits of Service.    Applicant points out that

the initial Complaint without exhibits was 40 pages long. It required substantial time by Applicant for its analysis, research on the legal elements necessary for each of the Causes of Action, and for its preparation.

## IV. <u>FIRST MOTION TO DISMISS</u>

26. Applicant received, reviewed, and legally analyzed the Defendants' motion to dismiss the initial Complaint. In summary form, Defendants requested the Complaint's dismissal for the following reasons:

    (a)   It failed to set forth a valid RICO Cause of Action because it did not plead that the wrongful acts of the Defendants took place over a period which was more than two years;

    (b)   It failed to set forth specific allegations as to Civil Conspiracy and Fraudulent Misrepresentation;

    (c)   It failed to set forth a valid claim for Negligent Misrepresentation;

    (d)   It failed to set forth a valid claim for Monies Had and Received;

    (e)   It failed to set forth a valid claim for Unjust Enrichment;

(f)   It failed to set forth a valid claim for Third Party Beneficiary; and

(g)   It failed to set forth a valid claim for Alter Ego Liability.

27.   In opposition thereto, Applicant was required to perform legal research on the defenses raised by the Defendants. Applicant prepared a fifteen page Declaration in Opposition and a twenty-five page Memorandum of Law. Applicant then reviewed and analyzed the Defendants' ten page Reply Memorandum of Law.

28.   On June 11, 2004, the Court at a telephone conference read into the record, a decision which dismissed the Complaint. The Court stated it believed that in the Second Circuit, although other circuits differed, in order to sustain a RICO Complaint, the wrongful activity had to go on for a minimum of two years and the Complaint only alleged an eighteen-month period. The Court also stated that the plaintiff would be given an opportunity to file an amended Complaint, and that the Court believed that the various State Court actions as alleged had merit.

29.   The Court required the plaintiff ("Applicant") to file an Amended Complaint within approximately three weeks. In order to accomplish same, it was necessary for Applicant to ascertain if the Defendants' wrongful activity extended beyond the eighteen-month period alleged in the Complaint. Applicant met

with representatives of Quantum and their counsel. From a series of conferences and communications with Quantum, Applicant ascertained that prior to doing business with Annodeus the Defendants had perpetrated similar wrongful activity upon Quantum. This relevant fact extended the Defendants' wrongful activity beyond the two-year period, which was required to sustain a RICO Cause of Action. Quantum also informed Applicant that Eugene Boffa's father had been found to be a member of organized crime. Applicant then analyzed a report written by the Honorable Irving R. Kaufman as part of a presidential report on organized crime with labor unions. The report stated that Eugene Boffa, Sr. was a member of organized crime, and that he had paid his son Eugene Boffa (one of the Defendants) thousands of dollars for unearned legal fees.

30. Applicant prepared a First Amended Complaint and caused same to be served upon the Defendants. Applicant then prepared and filed the requisite affidavits of service. Applicant points out that the preparation of the First Amended Complaint was quite time consuming and without exhibits, it was 56 pages long.

31. Applicant then received and reviewed the Defendants' motion to dismiss the First Amended Complaint. Prior to preparing a declaration and Memorandum of Law in opposition, Applicant was required to perform legal analysis of each

argument in the Defendants' Memorandum of Law. In response thereto Applicant prepared a three page declaration in opposition and a twenty-one page Memorandum of Law. Thereafter Applicant reviewed the Defendants' fourteen page Reply Memorandum. On September 16, 2004, the Court rendered an opinion and order, which denied the Defendants' motion to dismiss the First Amended Complaint, and sustained all of its Causes of Action.

A.    <u>Defendants' Answer to our First Amended Complaint</u>

32. Applicant then reviewed the Defendants' Answer to Complaint. Said Answer contained a denial of each of the plaintiff's Causes of Action, 14 affirmative defenses and counter claims which stated in a summary fashion the following:

     (a)   The payments to Quantum and others were appropriate because Annodeus subordinated its security interest to Quantum and authorized payments of the PPV proceeds to others;

     (b)   The order settling the HHG bankruptcy which carved out the Causes of Action against the Defendants released the Defendants from all Causes of Action set forth in the First Amended Complaint;

(c) Certain of the Causes of Action were barred by either the Statute of Limitations, Doctrine of Laches or Doctrine of Estoppel; and

(d) Because all of the Causes of Action should be dismissed, the plaintiffs breached the terms of the bankruptcy settlement order in HHG's bankruptcy and therefore the Defendants were entitled to damages for said breach.

33. Simultaneously with reviewing the defendants' Answer, Applicant prepared, filed, and served a reply, which denied the Defendants' counterclaim.

## V. <u>DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

34. Applicant then received and reviewed the Defendants' Notice of Motion for partial summary judgment and a Memorandum of Law in Support. Applicant points out that the motion with exhibits was approximately four (4) inches thick and the Memorandum of Law approximated twenty pages. In order to oppose that motion Applicant was required to review the motion and its exhibits and each case cited in the Defendant's Memorandum of Law. Applicant prepared a Declaration in Opposition and a twelve page Memorandum of Law which stated in great detail that HHG's

bankruptcy order, which carved out the Causes of Action against the Defendants, did not release them. Applicant then received and reviewed a decision by the Court, which denied the Defendants' motion for partial summary judgment. In response to this Court's order the Defendants made a motion for reconsideration. Applicant reviewed this motion and the Memorandum of Law in support thereof. In opposition thereto, Applicant prepared a declaration and filed same with the Court. This motion was never decided by the Court prior to the settlement of the suit.

## VI. <u>DISCOVERY</u>

35. Pursuant to Federal Rule 26(a)(1) of the Federal Rules of Civil Procedures, Applicant prepared an eight page document setting forth the following:

    (a) Persons with knowledge (7 separate individuals);

    (b) Relevant documents (approximately 50 documents under different headings);

    (c) Calculation of damages;

    (d) Insurance agreements; and

    (e) A privilege log on matters not disclosed.

36. Applicant prepared a Notice for Discovery and Inspection, which was some twenty pages long and requested

information on 90 different items. Applicant also prepared six pages of interrogatories requesting the answers to 10 different questions.

37. In response thereto, Applicant received and reviewed Defendants' answers and objections to the plaintiff's interrogatories.

38. Applicant also reviewed the Defendants' discovery demand for the production of some 96 documents. In response thereto, Applicant prepared a forty-nine page response, which responded to the Defendants' 96 interrogatories.

A. <u>Depositions</u>

39. Applicant reviewed the Defendants' notices of depositions. Applicant attended the depositions of five witnesses subpoenaed by Defendants. Prior to each deposition Applicant met with the witness and prepared him or her. Applicant points that our attendance at these depositions was very time consuming as a few of them lasted the entire day.

40. Applicant prepared notice of depositions for the five Defendants. Prior to each deposition of a Defendant, Applicant prepared the questions to be asked. The depositions of the three individual Defendants took approximately a day each. Applicant submits it was required to expend substantial time for the legal service that the lawsuit required for discovery.

## V.   **MEDIATION**

### A.   General

41.   The Court initially sent the parties out for mediation before Magistrate James C. Francis. Prior to attending the mediation session, Applicant reviewed applicable documents and prepared itself to present the Plaintiff's case. At the time of this mediation hearing, the Court had not yet rendered a decision on the Defendants' motion to dismiss the First Amended Complaint. Applicant made a proposal to the Magistrate as to what he thought this case should be settled for. The Magistrate informed Applicant after discussing the matter with the Defendants and hearing the Defendants' contentions, that he did not believe that any further mediation would be fruitful at that time.

42.   The Court then rendered two decisions, one which sustained the First Amended Complaint and the other, denying the Defendants' Motion for Partial Summary Judgment. Thereafter at a status conference before the Court, counsels for the parties informed the Court that they thought that it might be beneficial if the case was sent out again for mediation, which the Court did.

43.   Applicant then prepared a detailed pre-mediation statement. Applicant conferenced with the Trustee and briefed

him as to what the lawsuit was all about, and conferenced with James Ciarkowski (Debtor's President), and prepared him to present Annodeus's and the Debtor's side of the litigation.

44.  The mediation took an entire day. During the course of it, the parties several times almost walked out. Applicant pointed out it was able to negotiate a settlement subject to the District Court and this Court's approval of a settlement for $300,000. Applicant conveyed the settlement offer of $300,000 to the Trustee who did not stay to the mediation's end. Applicant and the Trustee then negotiated that out of the settlement proceeds with this Court's approval Applicant would receive $200,000, and the balance of $100,000 would be turned over to the Trustee and be disbursed by him pursuant to a further order of this Court.

## VIII.  **MISCELLANEOUS SERVICES**

45.  During the term of Applicant's retention, Applicant has either attended Court hearings on, or had communications regarding, or prepared or reviewed the following documents and items:

> (a)  Review of Pretrial Conference Order for May 7, 2004;
>
> (b)  Review and preparation of Order Extending Defendants' time to answer and waiving any defects on Service;

(c)  Review of  Scheduling Order on Defendants'
     Motion to Dismiss;

(d)  Review of Scheduling Order for Amended
     Pleadings;

(e)  Review of Order Dismissing Initial
     Complaint;

(f)  Filing of unreported cases cited in
     plaintiff's Memorandum of Law in Support of
     First Amended Complaint;

(g)  Review of Court's Opinion and Order Denying
     Defendants' Motion to Dismiss the First
     Amended Complaint;

(h)  Review of Defendants' demand for a jury
     trial;

(i)  Review of Order for Initial Pretrial
     Conference and Attendance at Pretrial;

(j)  Review of letter from Counsel for Defendants
     requesting an adjournment of Initial
     Pretrial Conference;

(k)  Various discovery issues;

(l)  Review of Endorsed Memo by Court Scheduling
     Pretrial Conference for November 12, 2004;

(m) Review of Scheduling Order by Court for Discovery and any Motions for Summary Judgments for Dismissal of Complaint;

(n) Order referring case to Magistrate Judge for mediation;

(o) Preparation of letter to Court extending Discovery deadline to April 7, 2005;

(p) Review of Scheduling Order setting Trial for May 2, 2005;

(q) Negotiations, review, and preparation of document encompassing order for Applicant's retention;

(r) Review Notice of Motion for Reconsideration Decision Denying Defendants' Motion for Summary Judgment;

(s) Review of Order concluding Fact Discovery on April 29, 2005;

(t) Order referring case to Mediation;

(u) Notice selecting Ed Sussman as Court Mediator;

(v) Preparation of order and affidavit for retention by Trustee;

(w)    Review and preparation of 9019 motion and attendance at Court hearing for order of settlement; and

(x)    Preparation of application for allowance, and notice for same, attendance at Court hearing and preparation of an appropriate order.

## IX.    SETTLEMENT DOCUMENTS

46.    Once the negotiations for a settlement were finalized, Applicant and the defendants' counsel then prepared the settlement documents. The documents encompassed a five page settlement agreement, stipulation and order of discontinuance with prejudice, two stipulations for judgments and reciprocal releases. These documents went through several drafts based upon the comments of various parties and their counsels. Once in final form Applicant caused the settlement documents to be executed and then approved by the District Court.

## X.    ALLOWANCES FOR COMPENSATION

47.    Applicant was first retained on the within lawsuit in January 2003. Our retention was on an hourly basis based upon Applicant's normal hourly charges for its fees. Pre-filing we gave the Debtor a credit of $42,500 for its payments

and $50,000 on our time charges. This credit came about when Applicant agreed to limit its time charges to $20,000 for the preparation of a first amended complaint and the services to oppose a motion to dismiss the complaint. Our actual time charges on these matters approximated $70,000 and Applicant only billed the Debtor $20,000. This reduction was based upon the Debtor's representation that the Debtor would pay our bills on a current basis and pay us the $20,000 if successful. Applicant points out that prior to the filing the Debtor did not live up to either of these representations. Subsequent to the Debtor's filing, Applicant was retained by the Trustee herein on an hourly basis but our fees are limited to be paid only from any sums recovered from the Defendants.

48. Applicant also points out that after the Debtor's filing, Applicant communicated with GMAC's counsel, the Debtor's insiders, and the Trustee herein. None of these parties were willing to pay Applicant on either its unpaid bills for services rendered or pay Applicant on a current basis for the future services and disbursements that the lawsuit required. Thus, Applicant's retention after the Debtor's filing was practically on a strict contingency basis.

49. During the course of Applicant's retention in the litigation, Applicant has been caused to render, and will render, no less than 1,500 hours of professional services for

the Debtor and Annodeus. Included in this amount is approximately 450 hours of services, which were rendered after Applicant's retention in the Debtor's Chapter 7 proceeding. Prior to the hearing on our application, our time records for our time will be submitted to the Court, the U.S. Trustee, and the Trustee's Counsel. The professional services rendered by Applicant demanded a high degree of said firm's professional competence and professional responsibility. Applicant sought to render such services in an efficient and economical manner on the legal issues which were presented to Applicant, and which involved many areas of law.

50. In view of the complexity of this case, the contingency of Applicant's compensation, the standing at bar of Applicant, the amount of legal services performed, the time consumed, the skill required by Applicant and the results achieved, Applicant requests that it be allowed the additional sum of $300,000 in addition to the $42,500 it received prior to the Debtor's filing. Applicant points out that of said $300,000 requested it will turn over to the Trustee with Court approval $100,000 to be distributed by the Trustee pursuant to a further order of this Court. Applicant points out that at our normal billing rates as summarized in Exhibit "B", Applicant's services on a strict time basis would entitle it to the additional sum of approximately $400,000. This number takes into account the

$92,500 of credit given to Annodeus and the $42,500 as set forth above.

51.   In   addition,   in   rendering   its   legal   services, Applicant disbursed the approximate sum of $18,800, as set forth in the annexed schedule, for actual and necessary out-of-pocket disbursements, which it has not been reimbursed for.

52.   Prior to the Debtor's filing, to facilitate the filing of an amended complaint, Applicant, Annodeus and Acclaim entered into a modification for the payment of Applicant's services. Up to this point Applicant was being paid for its services pursuant to its hourly billing rates. These rates were adjusted and Applicant's fees for the preparation and filing of an amended complaint and opposition to a motion to dismiss it would be limited to $20,000 if successful and the Debtor would pay for our services on a current basis. If not successful there was to be no charge to the Debtor for our services to prepare an amended complaint and oppose the motion to dismiss same. The Debtor never lived up to its part of the bargain and paid us neither the $20,000 nor our bills on a current basis. Applicant points out that our time charges to prepare an amended complaint and oppose the Defendants' motion to dismiss it approximated $70,000, and in requesting additional compensation has given the Debtor a $50,000 credit.

WHEREFORE, Applicant requests that it be granted additional compensation for the professional services rendered to this Debtor and its unpaid disbursement in the sum of $300,000, and that, of said sum it be authorized to keep $200,000 and to remit to the Trustee the sum of $100,000 which sum is to be disbursed by the Trustee by a further order of this Court, and that the Court grant such other and further relief as it deems just and proper.

Dated: New York, New York
       October 25, 2005

                              Respectfully submitted,

                              HOFHEIMER GARTLIR & GROSS, LLP
                              Counsel for the Debtor

                              By:  /s/ Gary B. Sachs
                              GARY B. SACHS (GS-4527)
                              Member of the Firm
                              530 Fifth Avenue
                              New York, New York 10036
                              (212) 818-9000